**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANDRE HILLIARD, ALLEN BROWN JR., JAMES REED, CHARLES KUCINSKY, AFTON FERRIS, IRVING MADDEN, JASMINE (JOSEPH) HERMAN, VICTAY COOPER-VOSS, PATRICE DANIELS, JAMES WRIGHT, SHAWN EAGAN, TYRAN (TIFFANY) HALL, DERRICK MACKLIN, DAVID MASON, NICKOLAS GARCIA, DAVID HUGHES, KEYSHAWN NICHOLS, BYRON PORTER, CORDELL SANDERS,** | **Case No._____** |
| **Plaintiffs,** | |
| **v.** | |
| **LATOYA HUGHES, Director of ILLINOIS DEPARTMENT OF CORRECTIONS, in her official capacity,** | |
| **Defendant**. | |

## CLASS ACTION COMPLAINT

Plaintiffs, Andre Hilliard, Allen Brown Jr., James Reed, Charles Kucinsky, Afton Ferris, Irving Madden, Jasmine (Joseph) Herman, Victay Cooper-Voss, Patrice Daniels, James Wright, Shawn Eagan, Tyran (Tiffany) Hall, Derrick Macklin, David Mason, Nickolas Garcia, David Hughes, Keyshawn Nichols, Byron Porter, and Cordell Sanders currently incarcerated in correctional centers of the Illinois Department of Corrections ("IDOC"), on their own behalf and on behalf of all people with mental illness who are now or will be incarcerated in IDOC correctional centers and in need of mental health treatment, complain as follows:

## I.     INTRODUCTION

1.     For decades, the thousands of people who are incarcerated in the Illinois state prison system have been denied needed mental health treatment while being subjected to conditions of confinement known to be harmful to mental illness. Despite IDOC's actual knowledge of severe and continuing harms, IDOC continues its decades-long failure to provide effective mental health treatment to the people in its custody and in fact maintains harmful, punitive, and often violent practices that actively worsen the mental health of individuals in custody.

2.     IDOC's response to people in its custody who have mental illness sends an unmistakable message that they should hide their symptoms (for as long as they can hold out) or face ridicule, violence, and punishment. Defendant often fails to heed individuals' calls for help until they are in the throes of a mental health crisis—including specifically self-harm or suicide attempts. Correctional staff then respond with force and punishment: tactical team cell extraction, oleoresin capsicum spray ("O.C. Spray" or "Pepper Spray"), physical violence, emergency enforced medications, prolonged and painful four-point restraints, and "crisis watch" placement.

3.     The prison units with large mental health caseloads are aggressively stressful, hostile environments in often physically unsafe conditions. Plaintiffs and others with mental illness are often isolated in their cells for days, if not weeks and months, on end, whether due to placement in restrictive settings—such as restrictive housing, administrative detention, privilege restriction, and "watch" status—or simply by virtue of widespread, frequent, and prolonged "lockdowns," in which the prison restricts individuals to their cells. It is now a standard practice of IDOC prison operations to routinely cancel out-of-cell activities; in many prisons dining halls and gyms are simply no longer used at all. Instead, individuals in custody are left locked in cells day after day regardless of the deleterious effects on their mental health.

4.    IDOC imposes these harsh conditions of confinement knowing that it is harming people with mental illness, reducing their ability to cope with the stresses of incarceration. Yet, any showing of that stress, any action or reaction, is too often met with discipline, resulting in more isolation and restriction, and loss of even the most basic "privileges"—talking to family, getting outside for an hour, listening to music—regardless of one's mental health needs and how isolation exacerbates mental health crises.

5.    While IDOC previously made some improvements in mental health treatment prior to 2020, it has since abandoned those efforts: staffing plans are now perpetually unfilled, constructed treatment facilities sit unused, treatment protocols ignored, paperwork and brief "check-ins" have replaced any semblance of therapy or care.

6.    Without needed mental health treatment in these toxic environments, the predictable results play out: mental illness is worsened, symptoms are exacerbated, suffering deepens, and any resulting behavioral acting out is met with a perpetual cycle of further harm—even more restriction, isolation, and force—not effective treatment.

7.    Each day hundreds of people are brought into this system, and hundreds are discharged from it. Putative class members are released from these harmful conditions of confinement with little to no preparation for their mental health needs and safety upon re-entry, placing them at high risk of re-incarceration, institutionalization, and other harmful outcomes.

8.    To remedy Defendant's failures, Plaintiffs bring this class action lawsuit pursuant to 42 U.S.C. § 1983 to redress violations of Plaintiffs' and putative class members' rights under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment, and pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131 et seq., and the Rehabilitation Act (the "Rehab. Act"), 29 U.S.C. § 794, to address their right to be free

of discrimination because of their disabilities. Plaintiffs seek a judgment declaring that the Defendant's treatment of the putative class violates the United States Constitution and federal disability rights laws. Plaintiffs further seek an injunction against Defendant's unlawful conduct to prevent further harm as set forth below.

## II.     JURISDICTION AND VENUE

9.     The Court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

10.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the district.

## III.     THE PARTIES

11.     Defendant Latoya Hughes ("Defendant") is the Director of the IDOC and is sued in her official capacity. Defendant, as IDOC Director, maintains administrative and supervisory authority over the operations of all Illinois state prisons.

12.     Plaintiff Andre Hilliard is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Joliet Treatment Center ("JTC") in Joliet, Illinois, and has previously been confined at Stateville Correctional Center Stateville Correctional Center ("Stateville") and Northern Reception Center ("NRC"), Lawrence Correctional Center ("Lawrence"), Pontiac Correctional Center ("Pontiac"), Dixon Correctional Center ("Dixon"), and Menard Correctional Center ("Menard"). JTC is located in the Northern District of Illinois.

13.     Plaintiff Allen Brown Jr. is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Joliet Treatment Center in Joliet,

Illinois, and has previously been confined at Pontiac, Dixon, and Menard. JTC is located in the Northern District of Illinois.

14. Plaintiff Victay Cooper-Voss is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Lawrence in Sumner, Illinois, and has previously been confined at Hill Correctional Center ("Hill") and Graham Correctional Center ("Graham").

15. Plaintiff Patrice Daniels is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He was recently transferred from JTC in Joliet, Illinois, where he had been placed for the last six years, to Dixon. He has also previously been confined at Stateville, Pontiac, Tamms Correctional Center ("Tamms"), and Menard. Dixon and JTC are located in the Northern District of Illinois.

16. Plaintiff Shawn Eagan is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Dixon in Dixon, Illinois, and has previously been confined at Stateville, Pontiac, Menard, JTC, and Centralia Correctional Center ("Centralia"). JTC is located in the Northern District of Illinois.

17. Plaintiff Afton Ferris is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. She is currently confined at Logan Correctional Center ("Logan") in Lincoln, Illinois, and has previously been confined at Dwight Correctional Center ("Dwight"), Elgin Correctional Center ("Elgin"), and Joliet Inpatient Treatment Center ("JITC"). JITC is located in the Northern District of Illinois.

18. Plaintiff Nickolas Garcia is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Danville Correctional Center

("Danville") in Danville, Illinois, and has previously been confined at Pontiac and Pinckneyville Correctional Center ("Pinckneyville").

19. Plaintiff Tyran (Tiffany) Hall is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Logan in Lincoln, Illinois, and has previously been confined at Dwight, Elgin, and JITC. JITC is located in the Northern District of Illinois.

20. Plaintiff David Hughes is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Lawrence in Sumner, Illinois, and has previously been confined at Pontiac.

21. Plaintiff Charles Kucinsky is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Dixon in Dixon, Illinois, and has previously been confined at JTC, JITC, Lawrence, Menard, Pontiac, Shawnee Correctional Center ("Shawnee"), and Western Illinois Correctional Center ("Western Illinois"). Dixon, JITC, and JTC are located in the Northern District of Illinois.

22. Plaintiff Derrick Macklin is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Menard in Menard, Illinois, and has previously been confined at Lawrence and Pontiac.

23. Plaintiff Irving Madden is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Western Illinois in Mount Sterling, Illinois, and has previously been confined at Menard and Pontiac.

24. Plaintiff David Mason is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Lawrence in Sumner, Illinois, and has

previously been confined at JTC, Pontiac, Pinckneyville, Dixon, and Shawnee. Dixon and JTC are located in the Northern District of Illinois.

25. Plaintiff Keyshawn Nichols is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Pinckneyville in Pinckneyville, Illinois, and has previously been confined at Illinois River Correctional Center ("Illinois River").

26. Plaintiff Byron Porter is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Hill in Galesburg, Illinois, and has previously been confined at Stateville, Menard, and Pontiac.

27. Plaintiff James Reed is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Hill in Galesburg, Illinois, and has previously been confined at NRC, Big Muddy, Western Illinois and Lawrence.

28. Plaintiff Cordell Sanders is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Pontiac in Pontiac, Illinois, and has previously been confined at Stateville, Lawrence and Menard.

29. Plaintiff James Wright is, and has been at all relevant times, incarcerated in the Illinois Department of Corrections. He is currently confined at Lawrence in Sumner, Illinois, and has previously been confined at Pontiac, Menard, and Stateville.

## IV. FACTUAL ALLEGATIONS

30. According to IDOC's own 2024 data, 12,817 individuals, or 44% of all those in IDOC's custody, are on the mental health caseload, meaning they have been diagnosed by clinical providers as having a mental illness and requiring treatment. Of those, about one-third are typically found to have serious mental illness ("SMI"). An SMI designation, according to IDOC protocols, means that the individual, because of a diagnosed mental illness, exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with their ability to

function adequately in the prison environment without supportive treatment or services. Plaintiffs and putative class members are people with mental health disabilities within the meaning of federal law as well as by IDOC's own designation.

### A. Defendant's Long History of Knowingly Ignoring, Punishing, and Exacerbating Mental Health Needs

31. For nearly two decades, Defendant has had actual knowledge that IDOC has failed to take reasonable steps to meet the needs of those people in its custody who have a mental illness and cannot otherwise obtain the treatment they need for themselves and has been inflicting unjustified harm on people with mental illness in its custody.

32. In 2007, Defendant was sued by individuals in IDOC with mental illness in the *Rasho v. Walker* class action litigation (No. 07-1297, C.D. Ill). Plaintiffs in *Rasho*, like Plaintiffs in this case, alleged that IDOC was not providing meaningful mental health treatment to people in its custody and was harming them because of their mental health disabilities.

33. During the course of the *Rasho* case, multiple court-appointed experts repeatedly found that IDOC was not providing needed treatment and was harming those in its custody. The first of these reports was completed in 2012 and found a lack of care and punitive—often violent—responses to mental illness. The findings of systemic failures continued with reports of the second expert, a court-appointed monitor in 2014, who advised the court that people with mental illness were being harmed by IDOC's practices, including by using "crisis" placements to punish those with mental illness instead of providing treatment. The expert also found that IDOC had failed to implement its own staffing plan, developed after the first expert report.

34. The third, an independent court-appointed monitor, issued reports to the district court from 2016 through 2022. In each report, the monitor found that IDOC was still failing to provide adequate mental health care, identifying many of the same harmful practices the prior monitors

had found, as well as many others. The harmful practices included medication mismanagement, lack of individualized treatment planning and care, the use of isolation resulting in further crises, and failure to respond to acute symptoms and signs of need for enhanced treatment.

35. At each stage of the *Rasho* case (subsequently renamed *Daniels v. Jeffreys* with the fourth amended complaint in 2021), Defendant was aware of the harm caused by the failure to provide meaningful care. At each stage, Defendant promised the court that it would implement changes to address the problems if only the court would give it more time. Yet even with ample time extending over years, Defendant never fulfilled its promises to address the risk of serious harm, or prevent the infliction of actual harm, on thousands of people in IDOC custody.

36. In 2022, after judicial oversight under *Rasho* ended, whatever efforts that had been underway were quickly abandoned and reversed, and whatever semblance of mental health care that IDOC had started to implement fell off a cliff. This—and Defendant's overall failure to achieve promised reforms—is most evident (as just one example) in the State's investment of many millions of dollars of construction of treatment spaces and units, which Defendant promised the Court would address IDOC's past failings but then failed to utilize for the treatment so desperately needed.

37. Over the last several years, there has been a top-to-bottom decline from what had already been a dangerously inadequate support system in the continuum of care for individuals with mental illness, including with respect to placement and assessment, group programs, individualized treatment and care, crisis intervention, and medication management, all within an overly punitive and understaffed system that is significantly worsening self-harm and outcomes for individuals with mental illness.

### B.    Defendant's Ongoing Dangerous and Harmful Treatment of People with Mental Illness

38.   Defendant is aware that IDOC correctional staff opt for punishment of mental illness instead of treatment. IDOC maintains a "crisis watch" system but instead of providing treatment or accommodation in response to well-known red flags for mental health deterioration, Defendant allows IDOC facilities to use crisis watch as punishment. This leads to cycles of torment where IDOC staff place individuals in highly restrictive and isolated conditions punishing them for their mental illness, without providing needed treatment or modifications to accommodate their mental health needs, resulting in even greater psychiatric harm which leads to more volatile behaviors that in turn generate even more punitive responses. Furthering this cycle of harms, IDOC has even retreated from prior practices that sought to accommodate mental health needs in its disciplinary practices under the *Rasho* case.

39.   Defendant has long known that isolation exacerbates mental illness. Studies have consistently found isolation to significantly worsen pre-existing mental illness, including a worsening of systems or onset of new symptoms, such as anxiety, panic, paranoia, depression, and psychosis; they have found severe and traumatic psychological and cognitive injury and that it can even lead to death.[1] Yet IDOC holds individuals in cell-restricted settings that have the same impact as solitary confinement, without accommodating their mental health needs. This includes crisis watch, restrictive housing, administrative detention, protective custody, extended lockdowns, or simply operational preferences to keep individuals in custody restricted to cells.

---

[1] *See, e.g.* Kayla James and Elena Vanko, The Impacts of Solitary Confinement, *Vera Institute* (April 2021), available online https://vera-institute.files.svdcdn.com/production/downloads/publications/the-impacts-of-solitary-confinement.pdf.; Brinkley-Rubinstein et al., Association of Restrictive Housing During Incarceration with Mortality after Release, *JAMA Network Open*, 2(10), (2019).

### (i)  Violent Responses to Mental Illness

40.  Use of force is particularly common in isolated and restrictive settings, such as crisis units, restrictive housing, and higher-security mental health units, where rates of serious mental illness are high. Despite an official policy that requires force to be used only as a last resort, security staff commonly use pepper spray and mace-ball guns against individuals with mental illness when they do not comply with an order, regardless of their mental health status. This occurs even in response to self-harm and suicide attempts, as well as other instances of behavioral health crises.

41.  IDOC's own data demonstrates an increased reliance on chemical agents overall and specifically when responding to people who are self-harming.[2] In 2023, IDOC used chemical agents on average 16 times per month when responding to self-harm and 75 times a month overall. In 2025, those numbers have jumped significantly to on average 37 times per month when responding to self-harm and 137 times a month overall. This means that currently, more than once each day someone in IDOC who is suffering with serious mental illness and engaging in self-harm is met with pepper spray or other chemical substances.

42.  Plaintiffs Hilliard, Hall, Ferris, Madden, Porter, Herman, Eagan, Mason, Sanders and Macklin have all been subjected to force when self-harming or actively in crisis. For example, at Lawrence when Mr. Mason recently self-harmed with a razor in the shower, an officer found him sitting and bleeding on the floor. Rather than provide him with first aid, the responding officer maced him repeatedly. Similarly, when Ms. Ferris was found strangling herself, IDOC staff handcuffed her to a stool and sprayed her with a chemical agent.

---

[2] *See* IDOC Operations and Management Report (OMR), Fiscal Year 2023, available online
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/reportsandstatistics/documents/FY23-OMR.pdf;
IDOC OMR, Fiscal Year 2025, available online
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/reportsandstatistics/documents/FY25-OMR.pdf.

**(ii)   Isolation and Restraint as Punishment for Mental Illness**

43.   Plaintiffs and other individuals with mental illness are often placed in isolation under the guise of "crisis watch" for prolonged and painful periods of time. They are not provided the treatment or help they need to get through the crisis or to help them stabilize, only isolated and restrained. These responses both punish those in crisis for their mental illness and further harms their mental health, exacerbating the symptoms and behaviors that led to the crisis in the first place.

44.   The isolation ("crisis watch") units are not therapeutic. They are loud and dirty, often in disrepair. Instead of keeping people safe from self-harm, broken fixtures provide tools to hurt themselves. The cells are not properly cleaned between uses, making them disturbingly dirty and often stained with blood and feces. The cells are barren with no furniture or amenities other than a toilet with a small, attached sink and a steel "bed" with only a thin mat. Plaintiffs Brown, Cooper-Voss, Eagan, Ferris, Hall, Herman, Hilliard, Kucinsky, Madden, Mason, Macklin, Reed, Sanders, and Wright, who are currently at eight different facilities, have all been placed in crisis cells that were filthy, stained with the feces and blood of others, and/or in disrepair.

45.   Plaintiffs on crisis watch are denied all clothing and property, given only a "smock" that—like the cell they are in—is often stained with the blood, urine, or feces of others. They are not even allowed basic hygiene, such as soap, toothbrushes, and toothpaste. Showers are provided intermittently, if at all.



*Figure 1. A typical smock provided by IDOC to individuals in custody on crisis watch.*

12

46. On crisis watch, Plaintiffs are stripped of their humanity. They are made to forfeit everything that could help them to cope or take their minds off the crisis that landed them in isolation—reading materials, TVs and radios, letters from home, and even their legal work. Their food is limited, they cannot have phone calls with loved ones, go outside for fresh air, or engage in any activity whatsoever. IDOC does nothing to accommodate their mental health needs but only punishes them for having the crisis.

47. Some individuals on crisis watch are also placed in four-point restraints. Four-point restraints are one of the most restrictive and dangerous interventions utilized. Contrary to all standards of mental health care, individuals in acute crisis are placed in four-point restraints without first trying other less-restrictive interventions. The restraints continue for hours, and sometimes even days, without meaningful interventions that should be used to reduce the length of the placement.

48. The punitive intent and impact of crisis watches and restraints is demonstrated further by the fact that when Plaintiffs are placed on crisis watch due to unmet mental health needs, they are often also disciplined for the exact same crisis incident or behavior. For example, Plaintiff Irving Madden has been ticketed for "refusing housing" when he was calling for a crisis team. Plaintiff Allen Brown was placed in restraints during a crisis watch placement and also ticketed for the same conduct resulting in months of segregation time and privilege restrictions, which only led him to further self-harm and painful suffering without the help he needed.

### (iii)     Formal Discipline of Mental Illness

49. Individuals with serious mental illness that impacts their functioning accumulate disciplinary actions (meted out precisely because of their mental illness) at a disproportionately high rate, including privilege restrictions that can keep them isolated and without the supports they

13

need, whether by way of disciplinary segregation ("restrictive housing"), "privilege" restrictions, or both.

50. The disciplinary process fails to accommodate their mental health disability and needs. Plaintiffs are often held for long periods on "investigatory status," a restrictive placement that can cause further harm just like segregation. Neither their mental illness and its impact on their functioning, nor the harmful impacts of further restriction on their mental health, are given appropriate consideration in the disciplinary adjudication.

51. Several years ago, IDOC adopted a policy for the stated purpose of reducing punitive disciplinary action for incidents resulting from mental illness and for individuals whose mental health would be harmed by disciplinary segregation. That policy has proven largely worthless; Defendant has failed to either prevent harm to those with mental illness or provide modifications to account for their mental health needs. While IDOC regularly assesses whether the required paperwork is filled out, the stated objectives of the policy are ignored and unfulfilled.

52. Within segregation, previous requirements for enhanced treatment, groups, and out-of-cell exercise have likewise gone by the wayside. IDOC now does little more than weekly perfunctory "mental health rounds" for those in restrictive housing, but these are only brief cell-front checks. They are not conducted by staff qualified to assess for decompensation of mental health and do little more than create paperwork to mask the absence of mental health support.

53. For example, Plaintiff Derrick Macklin has been in segregation since August 2023 and still has four years remaining. Despite being classified as having serious mental illness, he is not receiving any mental health treatment, out-of-cell time or supportive interventions. Instead, Plaintiff Macklin is isolated for 24 hours a day in cell, where his symptoms are worsening, including paranoia, anxiety, and hearing voices. Across the state at Western Correctional Center,

Plaintiff Madden experienced the same thing when he was placed in segregation for several months in 2024 with only brief cell front check-ins, little out-of-cell time, and no support for his increasing mental health needs. Mr. Madden reflected that "before segregation I couldn't really picture killing myself, but during segregation is when I started having more suicidal ideation and I started making a plan."

54. Further, while IDOC's written policy sets forth some protocols to consider mental health needs in "restrictive housing" placements and data reporting about its use, IDOC allows its facilities to circumvent even those limited measures. Facilities simply use "privilege restrictions" or "C Grade" as discipline instead of "restrictive housing." This can have the same, or even worse, impact on individuals in custody: denying them out of cell time except occasional showers, cutting them off from phone calls and visits with loved ones, denying them commissary to purchase food and hygiene items, and removing their TVs, radios, and tablets, leaving them with nothing to occupy their bodies or minds. It is restrictive housing but under a different name; one that lacks the same policies, protocols, and oversight as formal restrictive housing placements.

55. For example, Plaintiff Garcia has been on C grade on and off for years without access to phone calls or visits. Plaintiffs Porter, Reed, Nichols, Hall, Mason, and Macklin have had similar experiences. For many, phone calls with their family are the most important lifeline and when that is taken away, they experience increased anxiety and depression. At Hill and Western Correctional Centers, for example, there are now entire housing units that are "C grade wings" that function as the same or more restrictive than "restrictive housing."

56. The loss of contact with the outside world severely adversely impacts individuals' mental health, limiting their ability to cope and recover, making their periods of incarceration significantly more difficult, and often effectively extending their release date.

### (iv)  IDOC Allows Its Staff to Foster Self-Harm.

57.  Times of crisis can be the most critical for individuals with mental illness, and IDOC—on paper at least—has a purported "treatment" system for those moments. Yet instead of appropriate treatment in a therapeutic setting that could help the individual recover, the crisis care system is a lynchpin of IDOC's punitive and inhumane approach to mental illness.

58.  In nearly every progress note and treatment plan, IDOC's providers parrot the phrase the individual has been advised to ask for a "crisis team" if they need help. But the reality is that staff refuse to provide the crisis intervention response unless and until the individual escalates to self-harm as a last resort.

59.  While IDOC's protocols and policies require timely crisis intervention responses, that is not the reality for Plaintiffs and others in custody. For example, at Logan, Plaintiffs have been told by corrections officers that a new rule now gives them two full hours to call for crisis support—even while they are observing self-harm in real time. Similar practices are now the status quo at the other prisons, including those that, like Logan, have designated mental health treatment units.

60.  In a moment of crisis, when they were thinking of harming themselves, Plaintiffs Brown, Ferris, Garcia, Hall, Herman, Hilliard, Macklin, Madden, Mason, Porter, and Reed have all asked the staff in their unit for help only to be told to go ahead and harm themselves.

61.  Some corrections officers even tempt individuals to self-harm for sport, cruelly throwing cords and other objects into cells that serve no purpose other than to see if some individuals will use the objects for self-harm.

62.  At Joliet, Pontiac, Lawrence, and Menard, individuals in crisis have gone so far as to set their cells and bodies on fire in desperate attempts to bring attention to their needs. These

incidents have led to serious mental and physical injuries, several permanent—and at least two deaths. But incarcerated individuals still are not provided treatment to help them avoid such extreme measures.

63. IDOC staff has locked and continues to lock individuals in their cells knowing they have already—or are about to—set their own bodies or their bedding on fire. Just as IDOC staff for years have allowed people to self-harm by cutting, now staff will let them burn at the risk of their lives.

64. When the crisis team actually responds, it is little more than a formulaic and limited set of questions aimed at filling out paperwork and determining whether to place them in restraints or on "crisis watch." When self-harm or crisis is less physically tangible but no less serious, staff designated as crisis intervention team responders fail to provide interventions, treatment or problem-solving that could assist the person to stabilize, avoid crisis, and prevent self-harm.

65. Once on crisis watch, individuals are supposed to be observed by correctional staff for the stated purpose of preventing, or responding to, escalation and self-harm. But instead of providing protection or safety, crisis units are rampant with self-harm and deterioration, worsening mental illness. IDOC requires voluminous documentation by staff in these units but does not ensure that even that limited and essential function of the placement is met.

### (v) IDOC Denies Higher Levels of Care to Those in Need of More Treatment and Support.

66. Over the course of the *Rasho* case, the State of Illinois devoted significant resources to construction and then repeatedly pointed to its costly investments to give the appearance of effort to address the well-known failures in care, to convince the court to end judicial oversight, and as an excuse for their denying *actual* care. See, e.g., *Rasho* ECF 2405 at 13 ("To meet this objective, the Department has already invested more than $45 million to build new facilities and

17

rehabilitate existing facilities to provide mental health services to prisoners."). This focus on construction over care is a façade of a treatment system with unfulfilled promises to plaintiffs and the courts alike.

67. Despite IDOC's purported commitment to expand higher levels of care by building out designated treatment units, the *Rasho* court monitor consistently found that people in need of higher levels of care, often those cycling in and out of crisis watch settings, were not timely transferred to the designated treatment units.

68. Since the end of court oversight under *Rasho*, the numbers of placements in these treatment units (referred to as "RTU" or residential treatment unit) have declined even further. Moreover, although construction of a new, state-of-the-art, inpatient hospital was touted as the crowning achievement under *Rasho*, most of its beds sit empty. The facility is understaffed for its intended purpose despite significant need throughout the system for inpatient care and stabilization.

69. The few patients who are referred for higher levels of care by their treatment providers regularly must wait a month or more before being transferred.

70. For example, Plaintiff Kucinsky recently waited 8 months in the receiving unit at Shawnee to be transferred back to an RTU after he was abruptly discharged from the JTC on June 12, 2024. Prior to that, in 2023, Mr. Kucinsky spent months on crisis watch at Western Illinois before he was finally transferred to the new inpatient hospital in Joliet. There, he was one of just a handful of patients in the 150-bed hospital. He received inpatient treatment for nearly ten months before stabilizing enough to step down to the RTU at JTC but was only there for 90 days before being suddenly transferred to Shawnee general population, outpatient level of care where they could not appropriately house or care for him.

71. Similarly, Plaintiff Shawn Eagan was abruptly discharged from RTU in April of 2024. Mr. Eagan was awakened one morning with orders to pack his belongings, having been given no notice of or time to prepare for this major change. IDOC transferred him to a large downstate prison that had no capacity to provide the higher level of care that his treatment team had found he still needed. The move was part of IDOC's effort to reduce the RTU population that failed to consider the individuals' mental health treatment needs.

72. Within the RTUs, in any event, neither the conditions of confinement nor the treatment programming reflects the stated purpose and function of the specialized segregated settings. Simply put, the services that Defendant promised to the *Rasho* court would be provided in RTUs to escape judicial oversight largely are not being provided.

73. IDOC's own mental health protocols state that the RTU settings will provide "enhanced care" as well as more out of cell activity that is needed for those with serious mental health conditions to obtain or maintain stability. Yet, in most of these units neither is provided. Individual treatment with qualified mental health providers occurs just monthly at best. Few groups are structured for mental health treatment but instead are more superficially social in nature. Worse yet, programs and activities have been slashed by Defendant, leaving people known to be at risk of harm from isolation locked in cells for most days.

74. In many cases, "care" in treatment units is more punitive and restrictive than in non-treatment units, and they are often in utter disrepair—rampant with mold, broken plumbing, poor ventilation, and vermin. In many of the units, the individuals are restricted to their cells with far less meaningful activity or programs than is available in general population units. They are subjected to isolation, enforced medications, little support, and heightened use of crisis watch and restraint.

75. The JTC opened as result of the *Rasho* case—and once heralded as a model treatment unit—has starkly declined. No longer a place for recovery and stabilization, JTC now functions with the same harmful approaches as are endemic throughout IDOC.

76. When JTC opened in late 2017, it took an entirely new approach: JTC's operations were carefully designed and operated to provide meaningful treatment in a therapeutic setting that emphasized activity, recreation, and support. The therapeutic environment included a regular array of therapy (group, individual, and psychiatric) as well as robust out-of-cell activity, including that most of their day was out of cell in the dayrooms and often in structured activities such as community meetings, recreational therapy programming, gym and yard, school, and other programs. Plaintiffs at JTC had—for the first time in their incarceration—the experience of a truly therapeutic setting, and it was transformative. Individuals, including Plaintiffs here, who had spent years in cycles of segregation and crisis recovered to achieve stability at JTC.

77. But all that has ended following a change in leadership at JTC and the end of judicial oversight in *Rasho,* as IDOC has relinquished the principles that created a therapeutic environment in favor of a return to lockdowns, punishment, and restrictions. Defendant has abandoned all aspects of the program that made JTC its most successful RTU. JTC no longer treats its "residents" as patients, and instead responds to deterioration or instability with punishment. Groups are both less frequent and more formulaic, often superficially recreational instead of treatment-based, and even those are often canceled. Individualized therapy is now unheard of. Instead of being structured around out-of-cell activity, JTC rarely runs yards and frequently goes on "lockdowns" leaving the individuals confined to their cells for most of the day. The "level system" for progressing through the treatment program is a sham—all the levels are basically the same and to "test" into the next level, individuals are given the same test along with a handout with answers.

78. Likewise, Dixon's Psychiatric Unit, better known as "X-house," houses more than a hundred RTU level of care individuals but has long failed to provide enhanced care or out-of-cell activity and support; it is far from the therapeutic setting that it is supposed to be. Worse yet, conditions have only grown harsher, more restrictive, and less therapeutic in recent years. IDOC has installed cages to be used as "dayrooms" in what was open space within the galleries, and covered exterior windows with metal, blocking much-needed natural light. Out-of-cell time and activities have been reduced, and all individuals are now required to be restrained anytime they leave their cells (regardless of their security level or disciplinary status). Although it is a mixed security level RTU, it is run more like a segregation unit.

79. Likewise, what purports to be an RTU at Pontiac is similarly restrictive. The conditions are marked by isolation and disrepair of the housing units, which are often filled with smoke from fires. "Yard" (time spent in individual cages placed outside) is rarely provided and there is no dayroom. This results in their days-long confinement in unsafe cells not fit for human occupancy. There is no indication of therapeutic approach. Mental health providers routinely disregard patient confidentiality. Instead, they walk the cell house with correctional staff at their side doing brief checks through closed cell doors. The individuals here languish in their cells for days on end, often highly symptomatic. Self-harm and behavioral acting out proliferate as individuals struggle to cope and bring attention to their plight with over-restriction, isolation, deplorable conditions, and lack of meaningful treatment.

### (vi)     IDOC Fails to Provide Mental Health Treatment.

80. IDOC is not providing needed treatment for mental illness. As a result, IDOC is both failing to prevent harm and often *causes* great harm to individuals with mental illness.

21

81. Plaintiffs and others with more internalized symptoms—that is, those who are known to have mental health diagnoses but withdraw internally without, for example, acting out toward staff or engaging in significant self-harm—are ignored or not treated at all, no matter how severe the need. Many do not know their diagnosis or their treatment plan, even when they ask their assigned provider. For those who speak or act out as a result, the symptoms of their mental illness are frequently and discriminatorily mislabeled as behavioral or attitude issues.

82. Without an effective treatment system, Defendant leaves Plaintiffs without access to care. Requests seeking help often go unanswered or Plaintiffs are told they are on the waitlist for care, or there is simply no staff to provide it. Plaintiff James Reed made six requests in the last year to see a mental health professional and never got a response. Likewise, Plaintiffs Macklin, Mason, Cooper-Voss, Hughes, Porter, and Kucinsky have all had similar experiences in just the last year at facilities across the state.

83. IDOC has chosen to not provide a functioning mental health treatment system despite knowing it is required. IDOC has previously explained this by citing staffing shortages, but more than a decade has passed with it still failing to fulfill its own staffing plans. During *Rasho* court proceedings held in 2017 and 2018, IDOC admitted that the 115 Qualified Mental Health Professionals ("QMHPs") then on staff were not enough to provide the care needed for the more than 12,000 patients on its caseload. But staffing levels have only declined further without that court oversight under *Rasho*. As of December 2024, IDOC has only 67 full time QHMP positions filled out of 175 budgeted positions for a similarly sized caseload. In other words, IDOC now has reduced its QMHPs to roughly half of the number it previously admitted were insufficient to provide the care needed.

84. IDOC's persistent failure to meet its own staffing plan harms Plaintiffs. When Plaintiff James Wright wrote a grievance about the lack of mental health treatment, stating, "I need help," he was told: "at present, Lawrence CC has several vacancies within the area of mental health: mental health authority is vacant, all 8 mental health professional spots are vacant, and 2 behavioral health technician spots are vacant." Similarly at another facility, Plaintiff Nickolas Garcia requested monthly therapy and mental health groups but was told: "currently Danville C.C. has one Mental Health Professional (MHP), no groups are running at this time due to lack of staff." He was also told that an MHP had been hired and would start soon, but—8 months later—he was again told that there was no mental health professional on staff.

85. Instead of treatment provided by qualified professionals, IDOC allows its health care staffing vendor, Wexford Health Sources, Inc., to increasingly utilize bachelor's level staff, referred to as "Behavioral Health Technicians" to make "contact" with patients and complete a variety of forms that now substitute for treatment. These BHTs are not qualified to provide care and cannot offer therapy or treatment.

86. Group mental health treatment is a critical treatment component of a correctional mental health treatment system. But IDOC increasingly limits groups—in some facilities they have been eliminated completely for periods of time—and those that remain are mostly run by BHTs not qualified to provide treatment. Most are ineffectual, generally involving small talk or games with no meaningful curriculum or programming.

87. The sessions, whether individual or groups, cannot be considered 'therapy' in terms of evidence-based treatment. The confidentiality required for treatment is rarely provided.

88. IDOC utilizes a one-size-fits-all approach that leaves people with treatment needs without effective care. Individualized mental health treatment is the lynchpin to effective treatment

and required under all standards of care. While IDOC requires a form that is called an individual treatment plan, it does little to nothing to accomplish the stated purpose. IDOC's treatment plans do not facilitate treatment approaches that correspond to the individual's need, neither they nor the "providers" that work with them impact the individual in any manner. For example, a Plaintiff struggling with grief or symptoms of depression will have the same treatment plan as anyone else, even with completely different needs.

89. While steps were previously made to allow for the confidentiality that is foundational to proper evaluation and treatment under *Rasho*—including construction of new or improved treatment spaces—they have largely been discarded in favor of the ease of quick, cell front checks even though correctional officers and other prisoners are within earshot. The lack of confidentiality impedes any kind of therapeutic relationship, prevents meaningful assessment, and often leads individuals to minimize their problems to avoid revealing their symptoms to those around them, including correctional officers who may use that information against them.

90. IDOC's failures result in broken and ineffective relationships between QMHP's and Plaintiffs, due to limited opportunities for support, high staff turnover, and forced communications in public (non-confidential) settings. For example, Plaintiff Keyshawn Nichols has been fearful about confiding in his providers, both because of the limited sessions he was provided, as well as constant staff turnover. Plaintiff Jasmine Herman could not trust her QMHP because of the provider's willingness to allow others—both correctional officers and prisoners—to hear "sessions." The result was more stress resulting in worsening symptoms, self-harm, and isolation. Plaintiff Hughes, who needs confidential, intensive, one-on-one therapy to address his self-isolation has had several different QMHPs and Psychiatrists over the last year, making real engagement and treatment impossible as he is instead starting anew again and again. He finds

himself giving up and the experience of having to continuously start over is compounding his stress, anxiety, and overwhelming sense of loss.

91. With rushed check-ins—often on their housing unit floor—many individuals report that when they share their concerns with their providers, they are met with hostility rather than therapeutic care, defeating the purpose. Whether experiencing environmental stressors that ignite the symptoms of their mental illness or side effects of prescribed medications, Plaintiffs are not able to engage with their providers to address their needs, even in those limited occasions when there are actual providers to speak with.

92. IDOC further exacerbates its harm to Plaintiffs and others through frequent gaps in medications, lapsed prescriptions and other problems with medication administration; for example, running medication passes at irregular hours with not enough time—or too much time—between doses, or at extremely early morning hours when most are sleeping, or failing to deliver medications at all. Several Plaintiffs had their medications abruptly changed without a psychiatric appointment or simply stopped all together. These problems interfere with medication compliance and efficacy, which exacerbate symptoms of mental illness. Psychiatric medication mismanagement, limited access to needed medications, or inexplicable decisions to cut off medications for individuals significantly worsens outcomes.

93. Without an effective system for treatment that includes meaningful treatment planning, confidential counseling with consistent qualified mental health professionals, evidence-based therapy, and consistent psychiatric care, Plaintiffs and putative class members struggle to maintain stability and, when they experience instability or exacerbation of the symptoms, they do not receive the treatment or accommodation needed to help them stabilize.

        **(vii)    IDOC's Use of Isolation and Lockdown in the General Population Disproportionately Harms Those with Mental Illness.**

94.   IDOC's failures to provide effective mental health treatments are compounded by IDOC's operating protocols that effectively force all individuals in custody in many facilities into excessive amount of time in their cells, in near-constant lockdown that is effectively solitary confinement. At many prisons across IDOC, even those that are medium security, individuals in custody are locked in their cells 19 to 24 hours a day, with no exceptions or accommodations for those with mental illness.

95.   Recreation opportunities, such as gym, outdoor yard, and dayroom have all been drastically reduced, and even family visits and programs are often cancelled. The result is that what were once the conditions of restrictive housing have now become the standard conditions of many IDOC facilities.

96.   IDOC's own data shows that this trend towards "administrative lockdowns" has persisted and dramatically worsened for the last five years. The number of days on administrative lockdown increased nearly 650% from 2019 to 2024 (from 242 to 1570 days) as shown in the figure below from a recent report by the John Howard Association.[3]

---

[3] "Lockdowns, Overtime, and Unmet Needs: Why we must solve the current prison staffing crisis" by the John Howard Association, October 2024, https://static1.squarespace.com/static/5beab48285ede1f7e8102102/t/6716a720b96ce751025fc916/1729537824795/JHA+Lockdowns%2C+Overtime%2C+and+Unmet+Needs+Oct+2024.pdf



Figure 3. IDOC Lockdown Days

97.  Since July 2024, these extreme lockdown trends continue. For example, in the 214

days from July 1, 2024, to January 31, 2025, Menard has reported 184 days (85%) of administrative

lockdowns, which means Plaintiffs and putative class members at Menard spent most of their time

over the last seven months locked in cells.[4] Plaintiffs at Menard report not having had yard for

months, no dining hall or gym in memory, and few programs or other activities.

98.  Likewise, at Pinckneyville, a medium security facility, 171 of the 214 days (80%)

from July 1, 2024, through January 31, 2025, were spent under administrative lockdown. For

example, Mr. Nichols, who is housed in general population at Pinckneyville and not on any

disciplinary restrictions, is locked in his cell 19 to 22 hours per day. If he gets access to dayroom

at all, it is usually just for an hour and ten minutes a day, which is also his time to shower and use

the phone. He has no access to group activities and is offered no programming. He reports that

they are on administrative lockdown nearly every afternoon shift.

---

[4] Administrative lockdowns are lockdowns attributable to facility operations disruptions, most often linked
to insufficient staffing (rather than lockdowns resulting from security or disciplinary incidents). IDOC
publishes the number of lockdown days in its Operations and Management Reports and distinguishes
between incident-based lockdown days and administrative-based lockdown days. *See* IDOC Operations and
Management Report, Fiscal Year 2025, available online
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/reportsandstatistics/documents/FY25-OMR.pdf.

99. For years, IDOC has blamed staffing shortages for its inability to fully operate the prisons and the many lockdowns that result while endlessly promising that its investments would soon remedy the issue. But it is IDOC itself that has perpetually failed to sufficiently staff its facilities while continuing to house people in them without the staff needed to function. Defendant's own failure to effectively staff the facilities it operates cannot justify the harmful methods by which it chooses to operate these prisons.

100. Instead of addressing the staffing issue or at least making accommodations and transfers to ensure those with mental illness are not harmed by the staffing shortages, IDOC has failed to act. From 2022 to 2024, IDOC's overall vacancy rate for security staff has increased from 28% to 32%.[5] Many of the prisons with significant caseloads of people with mental illness and residential treatment units, such as Menard, Dixon, Joliet and Pontiac, have seen their staffing vacancy increase even more drastically to the troubling current levels resulting in harm to those with mental illness: Menard (38%), Dixon (41%), Joliet (56%) and Pontiac (56%).[6] This means that these facilities are often unable to run their yards, recreation, dining hall, mental health groups, and other regular activities that are crucial for health and humane conditions of confinement.

101. Without staff to oversee movement and activities, even when not on formal administrative lockdown, these prisons become de facto segregation units with individuals confined to their cells for days at a time while the yards, dayrooms, and dining halls sit empty. For example, at Pontiac, a new dining hall constructed just a few years ago has only been used once in at least the last year for a Thanksgiving dinner. Otherwise, Plaintiffs take their meals—cold trays delivered through a slot in their cell doors—in the same small cell where they sleep, toilet, and

---

[5] John Howard Association, Lockdowns, Overtime and Unmet Needs: Why we must solve the current prison staffing crisis, p. 4 (Oct. 2024), available online: https://www.thejha.org/special-reports/102124. ("JHA Report.")
[6] Id.

wait for the days to pass. Likewise at many other prisons, Plaintiffs rarely set foot in their dining halls. In the state's medium security prisons, Plaintiffs are often confined in their cells for days at a time; they can only look out the small window in their cell door to see the empty dayroom before them.

102. Whether caused by lockdowns, staffing shortages or as a restrictive housing placement in solitary confinement, the adverse impacts on Plaintiffs and harm to their mental health are equally egregious.

103. Defendant maintains these practices of keeping people with mental illness in isolative settings despite actual knowledge that this causes disparate harm to the thousands of people with mental illness who are in their custody. IDOC knowingly operates in this manner without making any efforts to meaningfully assess or respond to the impact on Plaintiffs.

### C. Defendant's Failure to Provide Mental Health-Specific Reentry Planning Disproportionately Harms People with Mental Illness.

104. Despite having re-entry preparedness for successful community supervision (known as "MSR" or "mandatory supervised release") and discharge at the heart of its mission,[7] IDOC operates its services and programs for those re-entering in a manner that puts incarcerated individuals with mental health disabilities at a distinct disadvantage. In most cases, mental health and disability needs are not considered in the discharge planning, placing these Plaintiffs at disproportionate risk of harm and re-incarceration during their period of MSR.

105. IDOC operates its MSR program so that most individuals without family homes to return to do not know where they will be placed until the weeks or days prior to their release. In those circumstances, IDOC does not consistently coordinate care for individuals on the mental

---

[7] "Defendant's mission statement is "to serve justice in Illinois and increase public safety by promoting positive change for those in custody, operating successful reentry programs, and reducing victimization." https://idoc.illinois.gov/aboususs/idocoverview.html

health caseload, or often even help them to plan for where they can go for care upon their release. The result is that many experience additional long gaps in treatment during the challenging period of re-entry, placing them at significant risk of harm, de-stabilization, homelessness, and re-incarceration or re-institutionalization.

106. IDOC fails to provide sufficient help with continuing psychiatric medications upon release to ensure that individuals can stay on their medications. This is particularly problematic for many for whom locating a new provider and getting into treatment in the community is delayed by the need to also get identification, enrolled for needed benefits, and find other community supports and services before they can access healthcare. For example, an individual may be released from IDOC with medication to last just a week or two but with no information about when or how to get a new prescription or restarted in treatment, much less the finances or insurance to do so.

107. Named Plaintiff David Mason experienced this twice within a single year, both times becoming unstable after discontinuation of mental health services and then getting "violated" and returned to IDOC. Plaintiff Mason is scheduled for release again in July—just four months away—and yet he still does not know where he will be released to or how he will get mental health treatment when he gets there.

108. IDOC's own reentry planning directive specifies that "A release plan shall be developed for each offender upon intake ... and shall give each individual an opportunity to complete programming and prepare for his or her release from custody." Illinois Department of Corrections. (March 1, 2023), Administrative Directive 04.50.101: Reentry Planning, 450101-reentry-planning.pdf (illinois.gov). IDOC's policies further require that a ". . . reentry plan shall

be established for each offender and shall focus on . . . identifying programming needs, developing a path to completion and confirmation of access to reentry resources." *Id.*

109. Plaintiffs are unaware of any such reentry planning for their benefit. Two of the named plaintiffs, David Mason and Victay Cooper-Voss are currently preparing for their releases, Mason in just a few months, and Cooper-Voss a year, and neither has been informed of any opportunities or programming to assist them so that they can get the benefits of successful release to their communities.

110. Not only are the re-entry needs of people with mental illness largely ignored by the system that is built around re-entry preparedness for those without disabilities, but IDOC often runs its rehabilitation programs in a manner that excludes people with disabilities. For example, state law and policy require that IDOC make "every effort" to avoid releasing people out of disciplinary segregation and instead should allow them to benefit from general population and rehabilitative programs prior to their release. But this mandate goes unmet for people with serious mental health disabilities who disproportionately fill the restrictive housing units, leaving them without access to rehabilitative programs.

### D. Plaintiffs, Each Diagnosed with a Mental Illness, have been Harmed by Defendant's Deliberate Indifference and Affirmative Conduct.

111. Each of the named Plaintiffs has been diagnosed with mental illness and found by clinical staff employed by either IDOC or its contractor, Wexford Health Sources, Inc., to require treatment for their mental illness. Their diagnoses include ADHD, adjustment disorder, anti-social personality disorder, anxiety, bipolar disorder, borderline personality disorder, intermittent explosive disorder, major depression, obsessive compulsive disorder, post-traumatic stress disorder, unspecified psychotic disorder, schizoaffective disorder, and schizophrenia, and/or a combination thereof.

112. Plaintiff Allen Brown Jr. is 37 years old and has been incarcerated for 13 years. He has long been classified as having serious mental illness by IDOC requiring Residential Treatment Unit ("RTU") level of care but does not receive the treatment he needs. Although he requires individual therapy to treat the serious effects of post-traumatic stress disorder, among other things, Mr. Brown has not received that individual therapy since approximately 2020. As a result, Mr. Brown has experienced frequent episodes of acute crisis and self-harm for which he receives little to no treatment. He often spends weeks and months at a time on crisis watch where he only sees mental health staff for short check-ins and periodic medication checks by the psychiatric provider, all through a small opening in the solid cell door. The mental health providers have abruptly changed his medications and treatment plans without a clinical basis and without helping him to get the treatment he needs. Mr. Brown's unfulfilled treatment needs are exacerbated by inhumane conditions of confinement, excessive use of force, isolation, restraint, and forced medications.

113. Plaintiff Victay Cooper-Voss is 24 years old and has been incarcerated for three years on an eight-year sentence. Mr. Cooper-Voss has been diagnosed with mental illness serious enough to require treatment since childhood but has never received the treatment he needs in IDOC. He has struggled with the loss of two brothers during his incarceration and the harsh conditions of confinement. He has been in segregation for 90 days; the unit is loud and chaotic, making it difficult to focus. He rarely gets out of his cell, just for showers and the occasional time — outside in a small cage. Although IDOC has designated him as having serious mental illness, he has not received any grief counseling, therapy, or other support to help him. His emotions are pent up, with anger and frustration growing; instead of finding help, inside solitary confinement those problems are building. His medications are less effective, but there is no other form of help provided. Although he has been told to request a crisis team when he needs help, he has learned

from terrible experience that it would not be worth the risk of the harm that would be done to him by placement on "crisis watch"— isolated for days, in a filthy cell with no property or even the ability to shower.

114. Plaintiff Patrice Daniels is 49 years old; he has been incarcerated since the age of 19 on a life sentence. He has been diagnosed with a serious mental illness and is outpatient level of care after being in an RTU for more than a decade. Mr. Daniels spent many years in segregation, where he regularly engaged in self-harm to cope with the stress of isolation. When the symptoms of Mr. Daniels's serious mental illness worsened in isolation, he was subjected to discipline, further isolation, restriction, restraint, and violence instead of care and accommodation. He long ago completed the rotation of treatment groups that JTC provided and then moved to "mRTU", which meant he did not get the enhanced treatment while still being segregated in the treatment unit. In February 2025, he was suddenly discharged from the RTU without notice and abruptly transferred. No efforts were made to prepare him for placement in an outpatient general population setting for the first time in more than a decade, including that his treatment plan had not addressed the change.

115. Plaintiff Shawn Eagan is 45 years old and has been incarcerated since 2001— approximately 24 years. He is designated as having SMI. Mr. Eagan spent nearly six years at JTC, where he previously improved with the provision of more intensive treatment opportunities, socialization, and increased out-of-cell activity including employment opportunities. However, by early 2024, with JTC's operations having changed drastically and because of inconsistent delivery and irregular hours by the nursing staff, he became non-compliant with his medications. Despite an evaluation that called for continued RTU level of care, he was abruptly discharged from the RTU and transferred to a general population prison in southern Illinois. The sudden

discharge without any warning was shocking and traumatic. At Centralia, he then spent weeks on crisis watch and was not returned to an RTU for 3 months, despite his need for a higher level of care. He was finally transferred to the RTU at Dixon in July 2024. At Dixon, the isolation caused by constant lockdowns and the lack of consistent, confidential mental health treatment have caused Mr. Eagan's mental health to deteriorate. As a result of these conditions and the lack of treatment, Mr. Eagan is experiencing increased symptoms including of depression, hearing voices, anxiety, and paranoia.

116. Plaintiff Afton Ferris is 35 years old and has been incarcerated for 16 years. Ms. Ferris is designated as having serious mental illness and is currently considered "modified RTU" level of care. She has spent significant time in RTU level of care as well as in the inpatient hospital. Ms. Ferris has consistently engaged in self-harm and has spent long periods of time in crisis cells and in restraints. When in crisis, Ms. Ferris has been sprayed with O.C. spray. Rather than receiving individualized treatment from qualified mental health providers, Ms. Ferris participates in mental health groups run by BHTs that largely consist of coloring and reading books. She does not receive treatment for her individual needs, even after engaging in significant self-harm. Ms. Ferris has also experienced periods without receiving her proper medication, which has contributed to her time on crisis watch. The lack of treatment, harsh conditions of crisis watch, and prolonged time in restraints has led Ms. Ferris to feel hopeless, obstinate and engage in further self-mutilation.

117. Plaintiff Nickolas Garcia is 39 years old; has been incarcerated for 14 years and is scheduled for release in 2028. Mr. Garcia is designated as having serious mental illness and was found "guilty but mentally ill" in his criminal case. Participating in regular mental health treatment is incredibly important for him. Mr. Garcia was long placed at Pinckneyville, which

despite being a medium security prison, was highly restrictive with many lockdowns resulting in long term isolation. In June 2023, he transferred to Danville, another medium security prison where he hoped to have improved conditions and mental health treatment. But when he arrived, he continued to be subjected to isolation and lockdowns without the mental health treatment he needed. Mr. Garcia has requested treatment consistently and has repeatedly been told that there are no staff to fulfill his requests. To date, he gets little treatment other than medications, including that he has only been called for mental health groups twice in more than a year and a half. Mr. Garcia is particularly concerned about having the treatment he requires to prepare for his reentry to the community.

118. Plaintiff Tyran (Tiffany) Hall is 43 years old and has been incarcerated for 16 years. Mr. Hall is designated SMI and on the mental health caseload. At Logan, Mr. Hall has been housed in RTUs, restrictive housing, general population, and is currently in protective custody (PC). Over the years Mr. Hall's time in isolation has had a lasting impact on him and has contributed to cycles of self-harm, time on crisis watch, and his current placement in protective custody. Mr. Hall's coping mechanism is to isolate by going on watch, hunger strikes, or requesting PC. The isolation then makes it more difficult to be around others when he does get the chance. Mr. Hall has requested to be in protective custody in part due to his anxiety and stress around his peers and his inability to get the mental health treatment he needs. On protective custody, he does not get access to yard, gym, or a job despite having had a job when he was in the general population. When he has been placed on crisis watch correctional officers have watched Mr. Hall self-harm without intervening. Mr. Hall has not had the treatment he needs to adequately recover from these events or find ways out of this pattern and prevent further harm.

119. Plaintiff Jasmine (Joseph) Herman is 50 years old; she has been incarcerated for more than 24 years and has another 17 years before her release. She has a long history of psychiatric distress and trauma and experiences frequent self-harm that is triggered by psychological and environmental stresses. Although she is assigned to RTU level of care and requires intensive therapy, she receives little and instead is often placed in isolation on crisis watch. While the providers at Pontiac know that trust and confidentiality are crucial for her, they ignore those treatment needs and instead do little more than the cell front check-ins required to complete their paperwork. Crisis watch has been used as a form of discipline, by keeping her on watch longer than necessary. While on crisis watch, she has no books and nothing to do in the cell, where she spends all her time—even the daily mental health assessments are through the solid cell door. She spends her days lost in her own thoughts, pacing or sleeping. As a result, she is severely harmed by the lack of mental health treatment and punitive conditions of confinement, which keep her in cycles of crisis, restriction, and discipline.

120. Andre Hilliard is thirty-years old and has been incarcerated since 2013. He is designated by IDOC as having SMI and is considered RTU level of care, but does not get the treatment he needs. IDOC does not provide the privacy and confidentiality that he would need to engage in treatment. In just the last few years two brothers of his brothers have died, but he has not been able to get any grief counseling, therapy or support to him help deal with those losses, much less address his other longstanding trauma and mental health needs. Mr. Hilliard has been in segregation for two months, since February 2025. Although the tickets that originally brought him segregation were expunged, he accumulated more while in the unit on "investigative status." He is locked in his cell all day most days with only about 4-6 hours in the dayroom a week. The segregation unit is filled with violence, distress, and frustration. Mr. Hilliard is constantly being

triggered by the conflict around him, with many individuals near him cutting themselves or setting fires in their cells as a means of self-harm. Staff sit by and allow it to happen, or worse seem to encourage it. Mr. Hilliard's own requests for help are often ignored; if he continues to complain he is thrown into crisis watch or restraints as punishment. In February 2025, he was held in four-point restraints for two and a half days. In March 2025, Mr. Hilliard spent hours trying to get confidential crisis team intervention to help him. Instead of getting help, Mr. Hilliard's requests were eventually met with violence by officers who came to take him to crisis watch. One officer shoved his shield into Mr. Hilliard's face, knocking out one tooth and chipping several others. Another officer sprayed a can mace on him as he laid on the ground, fully restrained and bleeding.

121. Plaintiff David Hughes is 66 years old and has been incarcerated for 30 years. Mr. Hughes is on the mental health caseload and has been designated as having SMI by IDOC. He is held at Lawrence for "protective custody" but is medium security level. He needs human interaction and activity, but he is often kept in his cell 23 to 24 hours a day. Other than monthly check-ins with a revolving door of different tele-psychiatrists about medications, Mr. Hughes's only contact with mental health staff are the BHTs who walk through the cell house asking how people are doing. He cannot speak to them about his needs in front of other inmates and staff, nor are the BHTs qualified to provide the therapy he needs. They pass out worksheets, or modules, that he can do alone in his cell, which is of little help. His despair, anxiety and depression often become overwhelming and are worsening with racing thoughts and sleeplessness. When he requested counseling—and even asked to go to a mental health unit to get treatment—he was denied.

122. Plaintiff Charles Kucinsky is 37 years old and has been incarcerated for 17 years. He is designated as having SMI and requires a higher level of care. From May 2023 to March 2024,

he was hospitalized in the inpatient unit in Joliet, then discharged to JTC for residential care, but then he was suddenly discharged to outpatient without warning or preparation for his mental health treatment needs. He was held at Shawnee for much of last year, spending months on crisis watch and then housed in Shawnee's reception center because the facility could not meet his needs. As the months passed, his condition worsened including with increasing thoughts of self-harm and suicide, actual self-harm, and a hunger strike lasting several weeks during which he lost significant weight. Even after Shawnee treatment staff referred him back for a higher level of care, he was not transferred back to an RTU for more than five months until February 2025. But now at Dixon, even though it is an RTU, there is little positive change. The environment is stressful and chaotic. He has had increased nightmares, distress, and exacerbations of symptoms. By March he was back on crisis watch but told he did not have a treatment plan; he has not had individual therapy of the kind that could help him to stabilize or cope.

123. Plaintiff Derrick Macklin is 36 years old and has been incarcerated for 14 years. He is designated by IDOC as having SMI. He has been in segregation for a year and a half, where his mental health needs have increased but his treatment has not. He only sees non-clinician staff (BHTs) at cell front for brief check-ins and has no therapy (group or individual). He rarely sees the tele-psychiatrist and his medications abruptly stopped for a month earlier this year with no follow-up. He is isolated in his cell 24 hours a day, 7 days a week. Without the help he needs, his already serious symptoms are worsening—hearing voices, seeing things, and paranoia—and he is having more difficulty controlling his moods and emotions. Security staff play on this, provoking him to "snap" and writing him tickets, resulting in more segregation time and more restrictions. He has told all this to mental health staff with no response.

124. Plaintiff Irving Madden is 50 years old and has been incarcerated in IDOC for the last 21 years. He has been held at Western Illinois since June of 2023, where he is on the mental health caseload in the general population. Mr. Madden describes these last several years as the worst in terms of mental health since entering IDOC in 2009. He has not had consistent individual or group therapy, with the opportunity to attend group only once in the last year. Contact with mental health staff has mostly consisted of cell front check-ins while in segregation. He does not have a trusting relationship with his psychiatric provider, who he sees only for short periods—not the time needed to address his struggles meaningfully—and who does not seem to take his concerns seriously. His requests for crisis care have been met with ridicule and discipline, subjecting him to even further restrictions without the support he needs. Mr. Madden has made multiple attempts at taking his own life at Western after being denied care and having his requests for crisis support denied. His attempts on his life have been met with excessive force, punishment, and lack of follow-up care; an officer transporting him to the hospital after a suicide attempt joked that he "didn't do it right." Despite multiple suicide attempts in the past year, IDOC has not changed his level of care or otherwise helped him to stabilize.

125. Plaintiff David Mason is 40 years old and has been incarcerated since September 2023 on a parole violation after having been incarcerated for ten years. In 2022, he was twice released on "Mandatory Supervised Release" without proper discharge planning for his mental health needs. He was twice returned and, on one occasion in 2022, housed in solitary confinement at the Northern Reception and Classification Center ("Northern Reception Center") for six months despite IDOC knowing that he has serious mental illness that is harmed by isolation. Mr. Mason is scheduled for supervised release again in July 2025, but to date IDOC mental health and clinical staff have not helped him to prepare for that release. At Lawrence, he receives little mental health

treatment. He has tried to request help from the crisis team several times when struggling to cope with anxiety and urges to self-harm but received no response. In one instance, the lack of responsiveness led him to attempt to take his own life. When correctional staff found him in the cell attempting suicide, they maced him and then took him to restrictive housing where he did not receive any additional treatment or help. As a result, he self-harmed again, and still never received the treatment he needed. In 2023, Mr. Mason was in RTU level of care at JTC, but asked to be discharged because the programming did not provide meaningful treatment or skill development; instead, for example, activities often consisted of card games and discussions unrelated to mental health. Throughout his incarcerations, whether in RTU or outpatient level of care, Mr. Mason has experienced many degrading and punitive responses to his mental health symptoms including restrictive housing, loss of privileges, isolation and even being fed only "meal loaf" (where staff mash all the food provided together into a single, unappetizing lump). As recently as March 2025, Mr. Mason was maced when he engaged in self-harm in a moment of crisis; he was then restrained and isolated without treatment or support to help him to stabilize.

126. Plaintiff Keyshawn Nichols is 25 years old and has been incarcerated for the last six years; he is scheduled for release in 2034. Mr. Nichols struggles with depression, anxiety, and anger. He often withdraws when he is feeling overwhelmed. He receives psychiatric medication but does not know his diagnosis or treatment plan, and he does not regularly receive mental health counseling or groups. Frequent turnover in mental health staff means when he sees a provider it is often someone he has never met before. This impedes his ability to build any trusting or therapeutic relationships. Mr. Nichols is in the general population and does not have any privilege restrictions, yet still is locked in his cell for 22 hours per day. The facility is frequently on "lockdown" status. At one point in late 2024, for example, the facility was on lockdown for 3.5

weeks in a row. This meant no yard, dayroom time, commissary, dining hall or other out of cell activity. During these periods of isolation on lockdown, his symptoms worsened but no mental health treatment is provided.

127. Plaintiff Byron Porter is 42 years old and has been incarcerated for 23 years. He has a history of inpatient mental health treatment and suicide attempts before prison, beginning at a young age. His childhood and adolescence were marked by repeated institutionalization for mental health treatment, through which he found therapy is what most helps alleviate his symptoms. In IDOC, he has not had that therapy. Mental health groups are only offered extremely sporadically; he has been allowed to go to just one group in the last year, and none in the last six months. His requests for crisis care are often dismissed unless he has already self-harmed. In the last year, he has been placed on crisis watch at least three times, including for nearly 12 days. The crisis watch cells are filthy with mace, blood, and feces. He is not allowed soap to wash his hands or utensils to eat with, and showers are contingent on agreeing to speak to mental health staff through the cell door in front of officers. The crisis watch placements have not kept him safe as staff have allowed him access to sharp objects and watched him self-harm without intervening. He has also been disciplined for incidents relating to his mental health needs, including when he has tried to demand crisis interventions in time of need, resulting in months in segregation and "C Grade" unit, with extreme restrictions on out-of-cell time, visits, and phone calls.

128. Plaintiff James Reed is 38 years old; he has been incarcerated in IDOC since 2024 and is scheduled to be released in 2029. When Mr. Reed was previously released from IDOC in 2018, he was not provided with any reentry support other than two weeks of medication. Upon his return to IDOC in 2024, he spent about twenty days in the Northern Reception Center, where conditions are that of solitary confinement regardless of mental health needs. He is now on the mental health

caseload in general population. Mr. Reed does not receive the mental health treatment he needs, either in mental health groups or individually. He has not received any response to multiple requests he has made for mental health treatment. The brief interactions he has had with a mental health provider have been conducted cell-front and only lasted seconds. When he was on crisis watch for three days, a mental health provider did not see him until his release. He has had gaps in his medications, and even has been given someone else's prescription. Other times when he has asked for a crisis intervention, he was told they are understaffed, and therefore crisis staff was unavailable. He is left without any provision of mental health services as there is no routine care and no way to get help when needed.

129. Plaintiff Cordell Sanders is 37 years old and has been incarcerated for 21 years. Mr. Sanders is designated by IDOC as having serious mental illness but receives little mental health treatment other than medications, including that he has not been in a single mental health group for the last year. In May 2024, Mr. Sanders was feeling extremely depressed and requested a crisis team for help. When help never came, he could not take it anymore and set a fire inside his locked cell. He was placed on "crisis watch" after this but given no meaningful treatment. Instead, he was punished with segregation and "C-grade" privilege restrictions, which meant he was cut off from his family, one of the only forms of support he had. He has been in segregation for the last year, during which time most of his contacts with the psychiatric and mental health staff occurred at his cell-front where others could hear. Without confidentiality, he could not share with the staff—who were supposed to be his treatment providers—what he was going through; he had to stay on guard as other prisoners and staff could hear. Without treatment or support, he has become hopeless and less able to cope with the stresses of day-to-day life in the segregation unit. As a result, he has accumulated more disciplinary tickets in what has become a cycle of harm where

he is stuck between crisis—where he is denied even such basic human needs as a bar of soap to wash with—restrictions, isolation, and discipline.

130. Plaintiff James Wright is 42 years old and has been incarcerated for 19 years, most of which was in solitary confinement in administrative detention and restrictive housing. He has now been in the general population for the last year and is working hard to improve himself, but he is not getting the mental health care help or support he needs. The result puts his stability in constant jeopardy. When he has asked for treatment, Mr. Wright was told that there are no mental health staff. When Mr. Wright needed help and requested a crisis team, it was not provided. Instead, he was subjected to violence by correctional staff and placed on "watch" status—isolation—without any meaningful treatment to help him to stabilize. Even when he came off of the watch placement last October, the follow-up that was supposed to happen to make sure he stabilized did not happen until very recently, in February 2025.

## V.    CLASS ALLEGATIONS

131. This action is brought by the named Plaintiffs on behalf of all persons who are now or will be incarcerated in adult correctional facilities operated by IDOC and who while incarcerated, are identified, should be identified, or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (hereafter, the "Class").

132. A class action is proper pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure.

133. Members of the Class on whose behalf Plaintiffs sue are so numerous that joinder of all members is impractical. According to the IDOC's website, in 2024 the agency was responsible

for the management of, on average, 29,778 adults, of whom approximately 45% were assigned to the mental health caseload.[8]

134. There are questions of law or fact common to all Class members. Defendants' failures to implement policies and procedures—including policies and procedures that at one time had been put in place in part to try to placate the court—to identify and care for the large number of individuals with mental illness currently in custody, to help prevent individuals from developing or exacerbating mental illness symptoms while incarcerated, or to limit the extent to which mental illness results in extra punishment, violates Plaintiffs' and the Class members' constitutional and legal rights. Plaintiffs' allegations of a broad pattern of unconstitutional and discriminatory policies and procedures presumptively create common issues of law or fact.

135. Plaintiffs' claims are typical of the claims of the Class. They arise from the same practices and courses of conduct that give rise to the claims of the other Class members.

136. Plaintiffs can fairly and adequately represent and protect the interests of the Class members. Plaintiffs have no conflict with the other Class members, since both Plaintiffs and the Class members share the same interest in receiving appropriate diagnoses and treatment for mental illness and in the implementation of policies to prevent individuals in custody from developing or worsening mental illness while incarcerated, and in being free of additional punishment because of mental illness. Class counsel are experienced in both civil rights and class action litigation.

137. Separate injunctive and declaratory actions maintained by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

---

[8] IDOC Annual Report, Fiscal Year 2024, available online
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/reportsandstatistics/documents/annualreports/FY24-Annual-Report-final.pdf

members, thereby establishing incompatible standards of conduct for Defendant. Adjudication regarding individual Class members would, as a practical matter, be dispositive of or impair the interests of other members not parties to the adjudication or substantially impair their ability to protect their interests.

138. Defendant has acted or refused to act on grounds generally applicable to the Class that Plaintiffs represent, thereby making final injunctive or corresponding declaratory relief appropriate for the class.

## COUNT I

### Deliberate Indifference to the Serious Risk of Harm
### In Violation of the Eighth Amendment

139. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

140. Defendant Latoya Hughes is the Director of the IDOC. She has overall responsibility for IDOC's operation, policies and procedures and the administration of all correctional facilities in the State. Director Hughes is sued in her official capacity.

141. Named Plaintiffs and the Class members have been deprived of and continue to be deprived of their rights under the Eighth Amendment by Defendants' failure to provide them with adequate mental health care and treatment while subjecting them to conditions of confinement known to be harmful to their mental health during their custody, which places them at substantial risk of harm. Defendant is aware of the substantial risk of harm from the deprivations and treatment set forth herein but has failed to take reasonable measures to address the risk of harm and prevent further harm.

142. Defendant knows of and disregards a serious risk of harm to people with mental illness in its custody. As a result of Defendant's actions and inactions, Plaintiffs and the Class members

have experienced and will continue to experience mental, emotional, and physical pain and injury, including by causing avoidable pain, mental suffering, and deterioration of their health.

143. Plaintiffs and the Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

144. Defendant's failure to take reasonable steps to address the deprivations to the Class that they have long been aware of, and their continued reliance on methods that they know have not and will not prevent the harm to the Class constitutes deliberate indifference in violation of the Eighth Amendment and Fourteenth Amendment.

## COUNT II

### Disability Discrimination in Violation of Title II of the Americans with Disabilities Act

145. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

146. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

147. IDOC is a public entity covered by Title II of the ADA as set forth in 42 U.S.C. § 12131.

148. Plaintiffs and members of the Class are individuals with disabilities within the meaning of the ADA in that they have mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Major life activities of Class members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself, eating, concentrating; as well limitations of brain function that result from psychiatric conditions.

149. As individuals incarcerated in the custody of IDOC, Plaintiffs and members of the Class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

150. Title II of the ADA requires IDOC to "make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

151. Title II of the ADA requires IDOC to "administer services, programs, and activities in the most integrated setting appropriate to the needs" of the Plaintiffs. 28 C.F.R. § 35.130(d); *See also* 28 C.F.R. § 35.152 (b) (2).

152. Title II of the ADA prohibits IDOC from utilizing methods of administration that, whether directly or through contractual arrangements, has the effect of subjecting Plaintiffs to discrimination on the basis of their disability. 28 C.F.R. § 35.130(b)(3).

153. Defendant violates Title II and the above implementing regulations when it discriminates against the Plaintiffs and Class members based on their disabilities by:

154. Subjecting them to isolative confinement that disparately impacts them due to their mental illness;

    a.    Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings, denial of privileges and use of force, as a result of their mental illness;

    b.    Denying those Class members subjected to isolated confinement and disproportionate discipline equal access to programs, services and activities that are available to those without disabilities;

    c.    Segregating RTU level of care Class members in conditions that are harmful to their mental illnesses and that deny them equal access to programs, services and activities that are available to those without disabilities;

> d.   Failing to make reasonable modifications to its policies, procedures and practices in order to accommodate the disability needs of Plaintiffs and Class members in order to prevent discrimination and harm; and
>
> e.   Excluding them from IDOC reentry programs and failing to provide appropriate and individualized reentry planning that accounts for their mental health needs and thus increasing the risk of institutionalization and recidivism among those with mental illness.

155. In the manner alleged above, Defendant has unlawfully discriminated against Plaintiffs and the Class members in violation of the ADA.

156. As a proximate result of Defendant's wrongful conduct, Plaintiffs and the Class members have suffered, and will continue to suffer, immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## COUNT III

**Disability Discrimination in Violation of Section 504 of the Rehabilitation Act**

157. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

158. Section 504 of the Rehabilitation Act provides that "[]no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

159. The IDOC is subject to the Rehabilitation Act as a state agency that receives federal financial assistance. 29 U.S.C. § 794(b); C.F.R. § 27.1.

160. Plaintiffs and members of the Class are individuals with disabilities within the meaning of the Rehabilitation Act and its implementing regulations in that they have mental impairments that substantially limit one or more major life activities. Major life activities of Class

48

members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself, eating, concentrating; as well limitations of brain function that result from psychiatric conditions.

161. As individuals incarcerated in the custody of the IDOC, Plaintiffs and members of the class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

162. Defendant discriminates against the Plaintiffs and Class members on the basis of their disabilities by:

163. Subjecting them to isolative confinement that disparately impacts them due to their mental illness;

      a.    Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings, denial of privileges and use of force, as a result of their mental illness;

      b.    Denying those individuals subjected to isolated confinement and disproportionate discipline equal access to programs, services and activities that are available to those without disabilities.

      c.    Segregating RTU level of care Class members in conditions that are harmful to their mental illnesses and that deny them equal access to programs, services and activities that are available to those without disabilities; and

      d.    Failing to make reasonable modifications to its policies, procedures and practices in order to accommodate the disability needs of Plaintiffs in order to prevent discrimination and harm;

      e.    Excluding them from IDOC reentry programs and failing to provide appropriate and individualized reentry planning that accounts for their mental health needs thus increasing the risk of institutionalization and recidivism among those with mental illness.

164. In acting in the manner alleged above, the Defendant has unlawfully discriminated against Plaintiffs and the Class members in violation of the Rehabilitation Act.

165. As a proximate result of Defendant's wrongful conduct, Plaintiffs and the Class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**REQUEST FOR RELIEF:**

Wherefore, Plaintiffs, on behalf of themselves and all Class members, and the Class members request that this Court:

1. Declare that Defendant's actions and inactions are unlawful and unconstitutional for the reasons specified above;

2. Enter a preliminary and permanent injunction directing Defendant to provide constitutionally adequate mental health treatment and to avoid discrimination on the basis of mental health disability;

3. Award Plaintiffs and the Class members their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 1988 and 42 U.S.C. § 12205;

4. Award any such further relief as the Court may deem just.

Dated: April 16, 2025

**RESPECTFULLY SUBMITTED**:

*/s/ Kenneth L. Schmetterer*
One of the Attorneys for Plaintiffs
Kenneth L. Schmetterer IL-6201860
Aima Mori IL-6333104
Constance Du IL-6345766
Paulina Starostka IL-6335087
Reema Holz IL-6345623
Ana Condes IL-6339460
**DLA Piper LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-4000/2176 (phone)
kenneth.schmetterer@us.dlapiper.com
aima.mori@us.dlapiper.com
constance.du@us.dlapiper.com
paulina.starostka@us.dlapiper.com
reema.holz@us.dlapiper.com
ana.condes@us.dlapiper.com

Amanda Antholt IL-6277047
Jessica Gingold IL-6329992
Sophia R. Lau IL-6330401
**Equip for Equality**
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 895-7330 (direct)
amanda@equipforequality.org
jessicag@equipforequality.org
sophia@equipforequality.org

Nicole Schult IL-6306949
**Uptown People's Law Center**
4413 N Sheridan
Chicago, IL 60640
(773) 769-1410 (phone)
nicole@uplcchicago.org