## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANDRE HILLIARD, *et al.*,      )
          )
    Plaintiffs,      )
          )     No. 25-cv-4117
   v.        )
          )     Judge April M. Perry
LATOYA HUGHES, Director of      )
ILLINOIS DEPARTMENT OF      )
CORRECTIONS, in her official capacity,      )
          )
    Defendant.      )

## OPINION AND ORDER

Andre Hilliard, Allen Brown Jr., James Reed, Charles Kucinsky, Afton Ferris, Irving

Madden, Jasmine (Joseph) Herman, Victay Cooper-Voss, Patrice Daniels, James Wright, Shawn

Eagan, Tyran (Tiffany) Hall, Derrick Macklin, David Mason, Nickolas Garcia, David Hughes,

Keyshawn Nichols, Byron Porter, and Cordell Sanders (collectively, "Plaintiffs") bring this case

against Latoya Hughes ("Defendant") in her official capacity as Director of the Illinois

Department of Corrections ("IDOC"). Doc. 1. Plaintiffs allege in the complaint that Defendant

fails to provide effective mental health treatment to individuals in IDOC custody, and maintains

harmful, punitive, and violent practices that worsen the mental health of such individuals. *Id.* ¶ 1.

The complaint asserts claims for violations of Plaintiffs' constitutional rights under the Eighth

Amendment pursuant to 42 U.S.C. § 1983 (Count I), and disability discrimination in violation of

Title II of the Americans with Disabilities Act ("ADA") (Count II) and Section 504 of the

Rehabilitation Act (Count III). *Id.* ¶ 8.

Defendant now moves for dismissal under Federal Rule of Civil Procedure 12(b)(1),

arguing a lack of standing, and Rule 12(b)(6) for failure to state a claim. Doc. 32. Separately,

Defendant also asks the Court to dismiss Plaintiffs' claims relating to isolation because those claims are already subject to an ongoing lawsuit, *Davis v. Baldwin*, No. 16-cv-600 (S.D. Ill.). *Id.* For the reasons set forth below, Defendant's motion to dismiss is denied.

## BACKGROUND

Plaintiffs are currently incarcerated at ten IDOC correctional facilities, including Joliet Treatment Center ("JTC"), Lawrence, Dixon, Logan, Danville, Menard, Western Illinois, Pinckneyville, Hill, and Pontiac. Doc. 1 ¶¶ 12-29. Plaintiffs have been housed at numerous other IDOC facilities during their time in custody, which spans from approximately one to thirty years. *Id.* ¶¶ 112-30. Fifteen of the plaintiffs have been in IDOC custody for at least ten years. *Id.*

Each plaintiff has been diagnosed with a mental illness and found by IDOC or its medical contractor to require mental health treatment. *Id.* ¶ 111. Twelve of the plaintiffs have also been designated by IDOC as having a "serious mental illness" ("SMI"), *id.* ¶¶ 112-18, 120-23, 129, which means that the individual, because of their mental illness, exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with their ability to live in the prison environment without supportive treatment or services. *Id.* ¶ 30. Plaintiffs' diagnoses include ADHD, adjustment disorder, antisocial personality disorder, anxiety, bipolar disorder, borderline personality disorder, intermittent explosive disorder, major depression, obsessive compulsive disorder, post-traumatic stress disorder, unspecified psychotic disorder, schizoaffective disorder, and schizophrenia, or a combination thereof. *Id.* ¶ 111. Several of the plaintiffs have suffered from suicidal ideation, suicide attempts, and self-harm. *See, e.g.*, *id.* ¶¶ 112, 114, 116, 118-19,

122, 124-25, 127. As such, certain plaintiffs were placed in residential treatment units ("RTUs") or on "crisis watch" in an isolated cell. *See, e.g.*, *id.* ¶¶ 112, 114-16, 118-20, 122, 125, 127-29.

Defendant's treatment of the mentally ill has been called into question since 2007 when IDOC was sued by individuals in its custody with mental illness who alleged they were not receiving meaningful mental health treatment and were being harmed because of their mental health disabilities. *See Rasho v. Walker*, No. 07-cv-1297 (C.D. Ill.).[1] In *Rasho*, court-appointed experts issued a series of reports regarding the mental health services provided by Defendant and Defendant's treatment of individuals with mental illness. *Id.* ¶¶ 33-34. Initial reports highlighted "a lack of care" and punitive or violent responses to mental illness, including the use of crisis placements to "punish those with mental illness instead of providing treatment." *Id.* ¶ 33. Later reports found similar issues of "medication mismanagement, lack of individualized treatment planning and care, the use of isolation resulting in further crisis, and failure to respond to acute symptoms and signs of need for enhanced treatment." *Id.* ¶ 34. As a result, Defendant "promised the court that it would implement changes to address [these] problems," including through construction of new treatment spaces and units. *Id.* ¶¶ 35-36. However, after judicial oversight ended in 2022, the conditions at IDOC facilities have purportedly worsened. *Id.* ¶¶ 36-37.

Plaintiffs claim that Defendant was aware of subpar IDOC conditions but failed to provide Plaintiffs with treatment and mental health-specific reentry services, which placed Plaintiffs at disproportionate risk of harm and re-incarceration during the mandatory supervised release period. *Id.* ¶ 104. Plaintiffs also claim that Defendant harmed them through prolonged

---

[1] The *Rasho* case is now captioned *Daniels v. Hughes*, No. 07-cv-1298 (C.D. Ill.). *See Daniels v. Hughes*, 147 F.4th 777, 780 (7th Cir. 2025). This opinion uses the original case name.

isolation, excessive violence, and punitive responses to symptoms of mental illness. *Id*. ¶ 38.
Plaintiffs include in the complaint numerous allegations of individual and systemic misconduct.

As alleged in the complaint, Plaintiffs experienced long periods of isolation that
worsened their preexisting mental illness under IDOC's "crisis watch system." *Id*. ¶¶ 38, 43.
Crisis watch cells were often not cleaned between uses, leaving them stained with blood and
feces, or with broken fixtures that inmates could use to self-harm. *Id*. ¶ 44. Increased isolation
often resulted in an uptick of symptoms, which led to additional discipline and isolation, in a
recurring cycle. *Id*. ¶¶ 38-39. Despite an official policy to "[reduce] punitive disciplinary action
for incidents resulting from mental illness and for individuals whose mental health would be
harmed by disciplinary segregation," *id*. ¶ 51, Plaintiffs Brown, Cooper-Voss, Eagan, Ferris,
Hall, Herman, Hilliard, Kucinsky, Madden, Mason, Macklin, Reed, Sanders, and Wright have all
been isolated and "placed in crisis cells that were filthy, stained with the feces and blood of
others, and/or in disrepair" while in eight different IDOC facilities. *Id*. ¶ 44.

Plaintiffs were also cut off from mental health treatment and prosocial activities (*e.g.,*
phone calls, out-of-cell time). *Id*. ¶¶ 46, 54-55. Even in general population settings, Plaintiffs
experienced high rates of isolation despite their mental health status. *Id*. ¶ 94. For example,
Menard was on administrative lockdown (*i.e.*, lockdown due to staffing shortages rather than
security concerns) for 85% of the days between July 1, 2024 and January 31, 2025, meaning
inmates were not permitted out of their cells. *Id*. ¶ 97. At Pinckneyville, Plaintiff Nichols was
housed in general population without disciplinary restrictions but still spent nineteen to twenty-
two hours per day in his cell without access to any group activities. *Id*. ¶ 98.

The complaint further alleges that although there was a policy that force should be used
"only as a last resort," prison staff routinely used pepper spray and mace-ball guns on inmates

4

with mental illnesses in response to self-harm or suicide attempts. *Id*. ¶ 40. In 2023, data from

IDOC showed that chemical agents were used an "average of 16 times per month when

responding to self-harm." *Id*. ¶ 41. By 2025, that number increased to an average of 37 times per

month. *Id*. "Plaintiffs Hilliard, Hall, Ferris, Madden, Porter, Herman, Eagan, Mason, Sanders and

Macklin have [each] been subjected to force when self-harming or actively in crisis," *id*. ¶ 42,

and individuals in crisis watch have also been placed in four-point restraints for lengthy periods

"without first trying other less-restrictive interventions." *Id*. ¶ 47. For example, Plaintiff Brown

was placed in restraints during a crisis watch and then "ticketed" for that same conduct, which

resulted in months of segregation and privilege restrictions. *Id*. ¶ 48. At other times, prison staff

actively encouraged inmates to self-harm or stated that there was a "new rule" that staff could

wait two hours to call for crisis support, even if staff actively observed self-harm. *See id*. ¶¶ 59,

61. "Plaintiffs Brown, Ferris, Garcia, Hall, Herman, Hilliard, Macklin, Madden, Mason, Porter,

and Reed have all asked the staff in their unit for help only to be told to go ahead and harm

themselves." *Id*. ¶ 60.

Moreover, Plaintiffs have been unable to access higher levels of care in a timely manner,

even after being referred by a treatment provider. *See id*. ¶¶ 69-70. One plaintiff spent "months"

on crisis watch before being transferred to JTC, where they were "one of just a handful of

patients in a 150-bed hospital." *Id*. ¶ 70. JTC was constructed due to the *Rasho* litigation and had

been designed to provide "meaningful treatment," including regular therapy and structured out-

of-cell activity. *Id*. ¶¶ 75-76. However, following the end of *Rasho*'s judicial oversight and

changes in leadership, JTC stopped offering individual therapy, began to go on frequent

lockdowns, and implemented "sham" treatment programs to artificially move inmates through

each level of treatment without actual improvement. *Id*. ¶ 77. Care provided outside of JTC has

been similarly bleak across different settings and facilities. *See id*. ¶ 82. Severe staffing shortages limited inmates' access to mental health treatment, *id*. ¶¶ 83-84, and the services provided, if any, were often run by "Behavioral Health Technicians," who are "bachelor's level staff" that "cannot offer therapy or treatment." *Id*. ¶ 85. Group therapy sessions often consisted of games, small talk, or coloring. *Id*. ¶¶ 86, 116.

According to IDOC policy, "individual treatment plans" were required for each inmate. *Id*. ¶ 88. In practice, however, there allegedly were no substantive differences across plans regardless of the inmate's individual diagnosis. *Id*. Instead, Plaintiffs received non-confidential "rushed check-ins" through their cell doors, *id*. ¶ 91, and experienced "frequent gaps in medications, lapsed prescriptions and other problems with medications administration." *Id*. ¶ 92. Several of the plaintiffs had their medications changed or terminated without any psychiatric appointment at all. *Id*.

It is further alleged that IDOC operated its discharge program such that inmates did not know where they would be placed until weeks or days prior to their release. *Id*. ¶ 105. Additionally, the discharge program did not provide inmates with a post-release treatment or medication plan, *id*. ¶ 106, and provided no accommodations or specialized programming for inmates with mental illnesses. *Id*. ¶ 109. As a result, inmates with mental illnesses faced increased risk of "de-stabilization, homelessness, and re-incarceration." *Id*. ¶ 105.

Plaintiffs now seek relief from such practices in the form of a declaratory judgment that Defendant's actions are unlawful and an injunction directing Defendant to "provide

constitutionally adequate mental health treatment and to avoid discrimination on the basis of mental health disability." *Id*. at 50.

## ANALYSIS

### I.     **Isolation Claims**

The Court begins with Defendant's argument that Plaintiffs' claims concerning isolation should be dismissed as duplicative of the claims brought in *Davis*. Specifically, Defendant argues that the Court should dismiss claims "based on unconstitutional conditions of isolation" because the *Davis* litigation will address the question of whether IDOC subjects individuals in its custody to extreme isolation. Doc. 33 at 13. Defendant further argues this case is duplicative of *Davis* because the class in *Davis* (which includes all prisoners who are now or will be incarcerated in IDOC adult correctional facilities) subsumes the proposed class here. *Id*. at 14. Similarly, Defendant claims that the *Davis* litigation also includes allegations related to mental health and seeks to implement a policy entitled "Standard 23-2.8 Segregated Housing and Mental Health," and therefore already addresses Plaintiffs' request for relief. *Id*.

A federal suit may be stayed or dismissed for reasons of wise judicial administration whenever the suit is duplicative of a parallel action already pending in another federal court. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 888 (7th Cir. 2012). A district court has "significant latitude on this question." *Id.* at 889. Generally speaking, a suit will be considered

7

duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993). [2]

The Court acknowledges that these plaintiffs are also class members in the *Davis* litigation. However, these plaintiffs bring the instant action with a distinct set of interests, goals, and claims from those at issue in *Davis*. Specifically, Plaintiffs' Eighth Amendment, ADA, and Rehabilitation Act claims are predicated on allegations that isolation of those with mental health illnesses is different and worse than isolation for those without mental health illnesses. Moreover, Plaintiffs' claims also include the use of excessive force in and outside of isolated settings, the increased use of discipline and privilege restrictions on individuals with mental illness, and access to adequate mental health care and treatment generally. As for relief, Plaintiffs ask for an injunction to establish adequate mental health treatment and to avoid discrimination on the basis of mental health disability, which may encompass but is not limited to minimizing isolation.[3]  These distinctions make it clear that this case is not a "word-for-word copy" of *Davis*. *See Askin v. Quaker Oats Co.*, No. 11 CV 111, 2012 WL 517491, at *3 (N.D. Ill. 2012).

The *Davis* court itself reached a similar conclusion when considering Defendant's argument that mentally ill prisoners should be precluded from *Davis* class membership by virtue of *Rasho*. There, the court found that although there is "overlap in the allegations between the two cases (which is not surprising given that mentally ill inmates in the IDOC are often subjected to restrictive housing), the claims simply are not identical." *Davis v. Hughes*, No. 3:16-CV-600-

---

[2] In addition to similarities in available relief, the Court may also consider whether the actions seek the same relief. *See, e.g.*, *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 838 (7th Cir. 1999) ("Parallel cases often seek the same relief.").

[3] Apart from mentioning that the plaintiffs in *Davis* have requested implementation of a model policy entitled "Standard 23-2.8 Segregated Housing and Mental Health," Defendant does not explain how (if at all) such a policy would address these plaintiffs' concerns about the crisis watch system and RTUs. Plaintiffs in this case have not requested implementation of that model policy, and therefore seek different relief than that sought in *Davis*.

MAB, 2025 WL 948443, at *6 (S.D. Ill. 2025). The *Davis* court further concluded that "these two cases were brought for fundamentally different reasons." *Id*. This Court agrees.

Because there are significant differences in the parties, claims, and relief sought, the Court concludes that this case is not duplicative of *Davis*. As such, "wise judicial administration" does not lead the Court to stay or dismiss the current action.[4]

## II.    Article III Standing

Next, the Court considers Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of standing.[5]

Before a class is certified, "the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009). To the extent there are multiple named plaintiffs, only one must have standing for a putative class action to move forward. *Id.* at 676-77. Standing is evaluated at the time suit is filed, *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee,* 708 F.3d 921, 928 (7th Cir. 2013), and requires the plaintiff to demonstrate that (i) they have suffered or likely will suffer an injury in fact, (ii) the injury likely was caused or will be caused by the defendant, and (iii) the injury likely would be redressed by the requested judicial relief. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). To "establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a real and immediate threat of future violations of their rights." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d

---

[4] It is of course possible that the relief granted (if any) in *Davis* may render some aspects of this case moot or the findings made in *Davis* (if any) could have preclusive effects in this litigation. *Davis* appears to be close to the end, while this case is just beginning. At this time, however, any such findings are premature.

[5] Absent standing, a federal court lacks subject matter jurisdiction over a case. *See Bazile v. Finance Sys. Of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). Therefore, a motion to dismiss for lack of Article III standing is properly brought under Rule 12(b)(1). *Id*. at 277.

1069, 1074 (7th Cir. 2013) (internal quotations omitted). Discriminatory practices can cause an injury in fact so long as the plaintiff was personally injured or denied equal treatment by the discriminatory practice. *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 821-22 (7th Cir. 2014).

Defendant argues that Plaintiffs lack standing to bring claims for injunctive relief because: (1) Plaintiffs have not alleged that they are actually or certainly facing impending harm in the future; (2) Plaintiffs have failed to identify a department-wide policy that sanctions the alleged misconduct and in fact acknowledge there are official policies to the contrary; and (3) Plaintiffs do not show that Defendant was deliberately indifferent to the risks attendant to their mental illnesses. The Court addresses each argument in turn.

First, the Court concludes that Plaintiffs have plausibly pled the present and ongoing denial of mental health treatment, excessive force, improper isolation, and discriminatory reentry practices, from which one can reasonably infer impending harm. It is true that in so doing, Plaintiffs allege a number of past injuries, including physical harm from the use of excessive force and worsening of their mental illnesses. For example, Plaintiffs allege that Defendant's actions have caused them an increase in serious symptoms like auditory and visual hallucinations and severe emotional distress resulting in self-harm or suicide attempts. *See, e.g.*, Doc. 1 ¶¶ 53, 114, 115, 123. But it is not just past injuries that Plaintiffs complain about. Plaintiffs have also plausibly alleged a predictable cycle of past injuries leading to future injuries, because as Plaintiffs' mental health symptoms worsen, Defendant engages in increasingly punitive conduct like using physical force and imposing isolation. *Id.* ¶ 41 (alleging that chemical agents are used in response to self-harm attempts more than once per day at IDOC facilities). For example, the complaint alleges that Plaintiff Ferris, who is designated as SMI, has repeatedly engaged in self-

10

harm, which has led to multiple instances of force being used against her. *Id*. ¶ 116 (being sprayed with OC spray while in crisis); *Id*. ¶ 42 (being handcuffed to a stool and sprayed with a chemical agent after having been found strangling herself). She also has not been given her proper medication, which has led to her being placed on crisis watch. *Id*. ¶ 116. This placement on crisis watch, which includes "prolonged time in restraints," has led to her engaging in "further self-mutilation." *Id*. This cycle of symptoms leading to excessive punishments leading to more symptoms suffices to establish a real and immediate threat of future injuries. *See Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899 (7th Cir. 2012) (finding that "an act which harms the plaintiff only by increasing the risk of future harm" can constitute an injury in fact); *Stewart v. McGinnis*, 5 F.3d 1031, 1038 (7th Cir. 1993) ("Evidence of past wrongs is probative of whether there is a real and immediate threat of future injury.").[6]

Additionally, at the time the complaint was filed, Plaintiffs alleged they were not receiving adequate mental health treatment, either because they were unable to access those services while in isolation, or because adequate services were not available at all. For example, Plaintiff Macklin is classified SMI and has been in segregation since August 2023. Doc. 1 ¶ 53. While there, he does not receive any mental health treatment, supportive interventions, or time outside of his cell. *Id*. The 24-hour-per-day isolation is causing his mental health symptoms to worsen. *Id*. The law is clear that failure to treat a medical condition is a *continuing* constitutional violation. *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("[D]efendants inflicted cruel

---

[6] It is the repeating cycle of violations against the same group of plaintiffs within Defendant's custody that distinguishes this case from those cited by Defendant in which each plaintiff had suffered only one injury and could not allege a real threat of future harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (finding that a single plaintiff's injury from use of a chokehold by police officers at the time of an arrest did not establish either that he was likely to have another encounter with police, or that if he did, those police officers would use a chokehold against him); *Sierakowski v. Ryan*, 223 F.3d 440, 442-43 (7th Cir. 2000) (finding a plaintiff's single HIV test does not make it more likely that he will be subjected to a future HIV test when there were no allegations suggesting a future test was likely).

and unusual punishment on the plaintiff by refusing to treat his condition. This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail.").

Plaintiffs have similarly plausibly alleged impending harm due to the lack of access to reentry planning and continued isolation. For example, Plaintiff Cooper-Voss was due to be released within the year after the complaint was filed but had no reentry plan in place at the time the complaint was filed. Doc. 1 ¶ 109. And several of the plaintiffs were in isolation at the time the complaint was filed.[7] Based upon all of these allegations, the Court has no trouble concluding that Plaintiffs are at risk of impending harm.

Defendant next takes issue with the fact that Plaintiffs fail to allege a department-wide policy of discrimination or misconduct. This would be more appropriately raised as a challenge to municipal liability rather than as a standing issue. But in any event, the Court has no trouble finding both that the complaint plausibly alleges an injury fairly traceable to the challenged action of Defendant and which is caused by a widespread pattern or practice by IDOC. It is not necessary to cite an explicit unconstitutional policy that has received "formal approval through the body's official decision making channels" in order to hold a government entity liable. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). "Informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly encourages

---

[7] Defendant suggests at various points that Plaintiffs' isolation claims are moot. Standing and mootness are different. *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."). Because standing is determined at the time of filing, mootness will only become an issue as to Plaintiffs' isolation claims if *no* Plaintiff is subject to isolation in the course of litigation. If that were to occur, the Court would need to evaluate whether those claims were in fact moot. But Defendant has not argued that every plaintiff is currently out of isolation, and therefore the Court need not address mootness at this time.

conduct depriving citizens of their constitutionally protected rights, may well satisfy the amorphous standards of § 1983." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir. 1983). Here, the complaint alleges numerous constitutional violations, taking place over a long period of time, involving at least nineteen inmates, at ten different IDOC facilities. This is more than sufficient to plausibly state a claim of a widespread pattern and practice of constitutional violations by IDOC.

Similarly unavailing is Defendant's claim that Plaintiffs have no standing because they have not properly alleged deliberate indifference. Deliberate indifference is an element of Plaintiffs' Eighth Amendment claim, which is distinct from whether Plaintiffs' injuries are fairly traceable to IDOC's conduct. "Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing." *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008). Plaintiffs need not "definitively establish that a right of [theirs] has been infringed" to demonstrate standing. *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) (internal quotations omitted). Here, Plaintiffs have plausibly alleged that IDOC is the cause of their injuries, insofar as IDOC's written guidelines with respect to mental illness are not being followed in practice. For these reasons, Plaintiffs have plausibly alleged a real and immediate threat of injury caused by the Defendant that could be redressed by this case. Defendant's motion to dismiss for lack of standing is denied.

### III. Motion to Dismiss for Failure to State a Claim

The last question before this Court is whether the complaint has plausibly alleged any claim for relief. A motion to dismiss under Rule 12(b)(6) is a challenge to the sufficiency of a complaint, not its merits. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering such a motion, the Court accepts as true all well-pleaded facts in the

complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016).

To survive a motion to dismiss, a plaintiff need only include "a short and plain statement of a claim that is plausible on its face and entitles them to relief." *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022). The short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Threadbare recitals of the elements of a cause of action and allegations that are merely legal conclusions are not sufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

As a threshold matter, Defendant argues that Plaintiffs have not stated a claim for relief, in part, because the complaint includes "factual allegations of each plaintiff's alleged experiences that involve complex and individualized diagnoses and treatments … [and] vague experiences" without "any discernable through line." Doc. 33 at 21. As such, Defendant argues the complaint does not set forth a short and plain statement that is "grounded in any plaintiff's alleged experience." *Id*. However, the Court is not persuaded.

A complaint must be read "sensibly and as a whole." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013). In this case, Plaintiffs bring systemic Eighth Amendment and disability discrimination claims based on a collection of individual experiences across various IDOC facilities. This approach is not only sufficient, but also important to plausibly establish claims against IDOC as an institution. *See Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981)

14

(noting that "a single incident of unconstitutional conduct by a municipal employee usually does not establish a sufficient basis for suing the municipality."). While the plaintiffs do describe individual instances of suffering, these incidents are pled for the purposes of establishing a plausible pattern of conduct by IDOC. And, as is discussed in more detail below, that pattern is not one that depends upon the nuanced individual diagnoses and treatment plans of each of the plaintiffs. Therefore, Plaintiffs have not failed to state a claim based on their pleading approach.

The Court moves next to whether Plaintiffs have alleged a plausible claim under the Eighth Amendment. A plaintiff bringing an Eighth Amendment claim for the denial of medical care must describe: (a) an objectively serious medical condition; and (b) deliberate indifference to that condition by the defendant. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). An objectively serious medical condition includes both conditions that have been diagnosed by a physician as mandating treatment or where the need for treatment would be obvious to a lay person. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Similarly, serious medical needs can include those that significantly affect an individual's daily activities or where withholding medical care results in needless pain and suffering. *Gutierrez v. Peters*, 111 F.3d 1364, 1371, 73 (7th Cir. 1997). Moreover, "[t]reatment of the mental disorders … is a serious medical need." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (internal quotations omitted).

Plaintiffs have plausibly alleged that they each have an objectively serious medical need. According to the complaint, each plaintiff has been diagnosed with a mental illness that requires treatment. Doc. 1 ¶ 111. Moreover, the majority of the plaintiffs have been designated by IDOC as having SMI, which IDOC states "interferes seriously with their ability to function adequately in the prison environment without supportive treatment or services." *Id.* ¶ 30. The complaint also

includes descriptions for each of the nineteen plaintiffs that details their length of incarceration, symptoms, and history of mental health treatment (or lack thereof) in the prison system. Many of these descriptions include instances of self-harm or suicide attempts, which independently reflect a serious medical condition. *Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025) ("A genuine risk of suicide or self-harm constitutes an objectively serious medical condition."). This is sufficient to establish the first prong of an Eighth Amendment claim.

The Court is not persuaded by Defendant's reliance on *Orr v. Shicker* for the proposition that a higher pleading standard as to each plaintiff's mental health diagnosis and treatment is required. *See* 147 F.4th 734 (7th Cir. 2025). In *Orr*, the Seventh Circuit found that the plaintiffs were asserting individual-capacity claims under Section 1983. *Id*. at 740. An individual capacity suit "focuses on the constitutional torts of an individual officer" *vis a vis* an individual plaintiff. *Id*. at 739. To that end, the Court concluded that each individual defendant was entitled to know which of the 2,000 class members he or she was alleged to have been deliberately indifferent toward, and how. *Id*. at 741. This case, however, raises official-capacity claims, which means it is IDOC's customs that are at issue. *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991). As such, the Court does not believe that the granular details requested by Defendant are required to plausibly state a claim to relief.

Plaintiffs have also plausibly alleged deliberate indifference. To establish deliberate indifference for the purposes of an official-capacity suit, the Defendant must know about the problematic custom or practice and do nothing. Actual knowledge of the defendant is required. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). However, "a prisoner need not present direct evidence of the official's state of mind: Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence[.]" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal quotations omitted). For example, evidence showing that certain practices were "longstanding, pervasive, well-documented … and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43. In such circumstances, a prison official does not need to know precisely which inmate is at risk of injury. *Id*. at 844. Moreover, actual knowledge can exist even in the face of an official policy to the contrary. *Daniel v. Cook Cnty.*, 833 F.3d 728, 737 (7th Cir. 2016) ("If a senior jail or prison official, including a person with final policymaking power, is aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety, his failure to enforce the policy could violate the Eighth Amendment.") (internal quotations omitted).

Plaintiffs here allege misconduct across multiple facilities and claim those allegations are representative of IDOC practices as a whole. The complaint also states that IDOC's systematic failures were detailed in reports created during the *Rasho* litigation,[8] and, therefore, shared directly with IDOC leadership. Based on these allegations, Plaintiffs have pled directly, or at the very least the Court can infer, actual knowledge of Defendant that there was an excessive risk to mentally ill inmates' health.

Plaintiffs have also plausibly alleged that Defendant disregarded the risks to their mental health. It is well-settled that "while a single negligent act cannot support an inference of deliberate indifference, persistence in a course of action known to be ineffective can[.]" *Rasho v.*

---

[8] Defendant argues that the Seventh Circuit has denied use of similar reports in *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019). However, *Wilson* involved the substantive use of reports at trial, which is not applicable here. The Federal Rules of Evidence do not apply to complaints; plaintiffs can rely on hearsay when pleading.

*Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (affirming a finding of liability where the evidence showed the jail management condoned its employees' repeated decisions to ignore its policies). Similarly, although non-medical officials may generally defer to the judgment of medical providers, an official's failure to remedy systemic deficiencies in medical services can constitute deliberate indifference. *See Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989).

Here, Plaintiffs allege care that is so blatantly inappropriate that non-medical officials can plausibly be held accountable. Plaintiffs claim that mental health "treatment" at IDOC consists of punishment, excessive force and taunting, isolation, and non-confidential care with unlicensed employees. "[M]edical professionals may choose from a range of acceptable courses based on prevailing standards in the field," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), but Plaintiffs allege treatment practices that significantly depart from any minimum standard of care and are antagonistic to their mental illnesses. Plaintiffs also have alleged a pattern of misconduct and staffing shortages that have not only persisted but gotten worse in the years since judicial oversight ended. If that were not enough, Plaintiffs have alleged that numerous corrections officers have done nothing to prevent – or worse, have encouraged – self-harm by mentally ill inmates. Doc. 1 ¶ 118 (Plaintiff Hall alleges that correctional officers have watched while he hurt himself); ¶ 125 (Plaintiff Mason requested help from crisis team when experiencing urges to self-harm and received no response); ¶ 127 (Plaintiff Porter alleges staff watched him self-harm without intervening); ¶ 59 (alleging that plaintiffs at Logan have been told by corrections officers that "a new rule" states they do not have to call for crisis support for two hours even while observing self-harm) ¶ 60 (eleven plaintiffs allege that when

18

they asked staff for assistance when considering harming themselves, the staff told them to go ahead and do it). This is the epitome of deliberate indifference to someone's mental health.[9]

For these same reasons, Plaintiffs have adequately alleged a claim based upon unconstitutional conditions of confinement. To state an Eighth Amendment claim for unconstitutional conditions of confinement, plaintiffs must: (1) demonstrate that the conditions they endured were "sufficiently serious" to constitute cruel and unusual punishment, and (2) show that the defendant responded with deliberate indifference. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Conditions are sufficiently serious when they result in an "unquestioned and serious deprivation of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993).

Here, Plaintiffs allege a set of conditions, including prolonged isolation, unsanitary cell conditions, and unnecessary use of restraints. Specifically, several of the plaintiffs have been placed in crisis cells stained with feces and blood without access to basic hygiene tools like soap or showers. Other plaintiffs have been in segregation for multiple years or are isolated for nearly 24 hours per day. These constitute plausible allegations of sufficiently serious conditions that could implicate the Eighth Amendment. *See e.g., Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (holding that deprivation of the "basic human need of rudimentary sanitation" can violate the Eighth Amendment); *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) (noting that 29 weeks in segregation could be actionable). Moreover, because Plaintiffs have alleged a (1) pattern of conditions that is representative of systemic practices; and (2) lack of reasonable efforts on the part of Defendant to improve such conditions, Plaintiffs have also sufficiently pled

---

[9] As these allegations demonstrate, Plaintiffs' complaints reflect more than just "plaintiffs' disagreements with the care they are receiving," as Defendant claims. *See* Doc. 33 at 24. The fact that some of the plaintiffs are receiving some mental health treatment does not absolve Defendant of its obligation to not be deliberately indifferent to an inmate in mental health crisis.

deliberate indifference for the same reasons explained above. These allegations are sufficient to state a plausible claim.

As a final remark on this topic, the Court briefly addresses Defendant's argument that Plaintiffs have failed to state a claim based on conditions of confinement or the use of excessive force because they do not point to an explicit policy dictating this treatment.[10] As is discussed more above, Plaintiffs have stated a claim for deliberate indifference because they plausibly allege a "series of violations" that are systemic in nature. *See Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003). There is no requirement that a defendant's unconstitutional treatment be pursuant to a written policy. Plaintiffs only need to allege facts permitting a reasonable inference that the pattern or practice is widespread and that the specific violations complained of were not isolated incidents. Plaintiffs have done so here.

Finally, the Court finds that Plaintiffs have adequately pled claims for systemic disability discrimination under the ADA and Rehabilitation Act. To state a claim under Title II of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must show: 1) they were a qualified individual with a disability; 2) they were excluded from participating in, or denied the benefits of a public entity's services, programs or activities or were otherwise discriminated against; and 3) that such exclusion, denial of benefits, or discrimination was by reason of their disability. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). Additionally, liability under the Rehabilitation Act requires proof that the Defendant receives federal funds. *See id*. Plaintiffs may establish discrimination in one of three ways: "(1) the defendant intentionally acted on the basis

---

[10] Defendant argues in her reply that Plaintiffs did not defend and therefore have waived claims based on unconstitutional conditions or excessive force. Doc. 45 at 2. The Court disagrees. It is generally true that when a litigant fails to respond to an issue raised in a motion it is waived. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). However, that is not the case here. Plaintiffs reiterate throughout their response individual and systemic claims regarding conditions of confinement and inappropriate uses of force. Simply because Plaintiffs have organized their response differently than did Defendant does not mean they have waived the issue.

of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). Plaintiffs do not need to allege discriminatory intent to state an ADA or Rehabilitation Act claim if they seek only injunctive relief. *See A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018).

Defendant does not dispute that Plaintiffs are qualified individuals and that IDOC is a covered entity under both statutes. Instead, Defendant argues that Plaintiffs do not plausibly allege unlawful disability-based discrimination because the only service, program, or activity described in the complaint is the "reentry program," and Plaintiffs claim that adequate reentry planning does not exist rather than alleging they are excluded from such programming. However, this is not an accurate reflection of Plaintiffs' complaint. The complaint lists a host of services that Plaintiffs are excluded from while housed in crisis watch or RTUs, including access to mental health treatment and activities and programming offered in the general population. Furthermore, Plaintiffs make a showing that they were "otherwise discriminated against" because Defendant's reentry program does not provide reasonable accommodations for mental health disability needs, which leads to increased risk of re-incarceration and homelessness following release. Similarly unavailing is Defendant's argument that even if the reentry program has a disparate impact on inmates with mental illness, Plaintiffs "fail to allege any basis to suggest that the reason for the reentry program or the content and limitations of the program was discriminatory." However, because Plaintiffs are not seeking monetary damages, they are not required to plead discriminatory intent. It is sufficient that Plaintiffs have alleged the program disproportionally impacts them.

## CONCLUSION

The Courts find that Plaintiffs have standing and have stated plausible claims against Defendant under the Eighth Amendment, ADA, and Rehabilitation Act. Defendant's motion to dismiss is denied.


Dated: March 5, 2026

                                         _____
                                         APRIL M. PERRY
                                         United States District Judge